THE STATE OF FLORIDA, ex rel. FRED H. DAVIS, Attorney General, CARRIE M. WICKER, unmarried, MRS. E. A. BINGHAM, a widow, OZEY E. HORTON, MILLARD C. HORTON, E. W. KELSEY, C. J. WEST and C. W. TOWNS, *Plaintiffs in Error, v. TOWN OF LAKE PLACID*, a municipal corporation, *Defendant in Error*.

147 So. 468.

En Banc.

Opinion filed April 13, 1933.

Re-hearing denied April 24, 1933.

420

*Sutton, Tillman & Reeves* and *Edwin Bronston,* for Plaintiffs in Error;

*Treadwell & Treadwell,* for Defendant in Error.

ELLIS, J.—In 1925 about four or five hundred people lived in a community, town, or settlement in Highlands County east of Lake Stearns about a mile and a half, and about four miles west of the lower end of Lake Istokpoga. The northern edge of the area occupied by the community of people rested upon an arm of Lake Stearns which extended into the Southwest quarter of Section 30 of Township 36 South, Range 30 East. The area of land occupied embraced about a half Section, approximately three hundred and twenty acres lying partly in Section 36 of Township 36 South, Range 29 East and partly in Section 31, Township 36 South, Range 30 East. The built-up portion of the town consisted of approximately two business blocks.

The Legislature of 1925, by Chapter 11586, approved December 5, 1925, in Extraordinary Session undertook to create a municipality of that community defining boundaries covering an area of more than twenty-eight square miles, an acreage of approximately 17,800 acres with a population capacity, exclusive of the area covered by lakes, of approximately 25,000 people on the basis of two persons average per acre. The boundaries covered an area of three and a half miles north and south by eight miles east and west. The name of the municipality was The City of Lake Stearns.

. : In 1927, about a year and a half afterward, the Legislature presumably acting under the Eighth Article of the Constitution, Section Eight, providing that the Legislature shall have the power to establish and to abolish municipalities, repealed the Act of 1925, Chapter 11586, *supra,* and erected in its place, or attempted to do so, a municipality called "Lake Placid," covering an area of approximately seventy-three square miles overlapping the area of former City of Lake Stearns and adding thereto an area of approximately forty-five square miles. Its total area embraced approximately 47,000 acres. Its far flung boundaries extended approximately nine miles east and west and nine and a half miles north and south. Its area, on the basis of the same average of inhabitants per acre, afforded room for about 100,000 people. It is one and a half times greater in area than Richmond County, New York, with its 160,000 population; nearly four times greater in area than New York County, with its 1,800,000 population; greater than King's County with its 2,500,000 population; twice as great in area as Bronx County with its 1,125,000 population. The area is greater than any Florida city of 20,000 inhabitants or more, and greater than the District of Columbia or the City of Atlanta.

These facts, gleaned from the allegations of the information in *quo warranto* lodged by the Attorney General in the Circuit Court for Highlands County, throw some light upon the other allegations in the information relating to the purpose to be accomplished by such an extraordinary exercise by the Legislature of the power to establish municipalities in this State.

A demurrer to the information was sustained and the information was dismissed to which final order a writ of error was taken by the Attorney General and Co-Relators.

Among the allegations of the information admitted by the demurrer were that certain corporations, owning eighty per cent of the land embraced within the boundaries of the municipality, entered into contract with the Lake Placid Club Company, a corporation, whereby the later Company would establish upon 3,000 acres of land, to be donated to that Company by the others, a health and recreation resort designed to attract visitors and residents to the community; that all the corporations would co-operate to procure legislation to reorganize the municipality of Lake Stearns by changing its name to Lake Placid, change the name of lakes and creeks in the vicinity, altering the plan of government, extend the boundaries by adding a much larger area of land than existed within the boundaries of Lake Stearns, and the protection of the parties to the agreement in the "taxing of outlying lands embraced within the new municipality."

The purpose shown by a recital in the agreement was to enhance the value of the lands of the parties to the enrichment of the property owners who were parties to the agreement.

The Legislature afterwards enacted Chapter 12990 Special Acts, 1927. The charter providing that of the five commissioners constituting the governing body of the municipality three are to be elected by the voters, and two commissioners, who need not be residents of the town, one of whom to be selected by the tax payers "representing the majority in value of the assessments of property" situated "within the East district" and the other commissioner to represent the territory lying west of Lake Childs chosen in the same manner. Each commissioner to have the same powers, privileges and authority. Three commissioners constituted a quorum, except where the charter or ordinances requires more than three affirmative votes to take action. All ordi-

nances and resolutions or votes for levying taxes or special assessments for issuing bonds or incurring indebtedness require five affirmative votes.

The powers conferred upon the municipality were varied and numerous, among others to "in general define, prohibit, abate, suppress and prevent all things detrimental to town health, morals, comfort, safety, convenience or welfare, *or to* its *reputation* as. a *carefully protected resident park* for *cultivated Christian people."* It had power to exempt property from taxation which the commission deemed of "importance" to the welfare of the town.

Since the Act, Chapter 12990, *supra,* was enacted the corporations promoting the enterprise have transferred practically all their "holdings" to the Lake Placid Land Company, one of the five corporations which entered into the contract with the Lake Placid Club Company. The corporations own property in the built up portion of the town.

The five corporations own approximately forty-two sections of approximately seventy-three sections of land included within the boundaries of the town, and the lakes—Stearns, Francis, Henry, Clay, Huntly, Childs and other small ones lying within the boundaries of the town—cover about sixteen sections. The Co-Relators own about seven sections lying in the extreme northeastern part of the territory, the nearest part of their holding lying about two miles eats of the "built up" portion of the town. The voting population of this territory is about 115. The Co-relators were not parties to the contract with the five corporations and the Lake Placid Club Company.

The property of the Co-relators is not reached by any improvements contemplated by the town, the lands are rural and far removed from the advantages of city life. The same may be said of the land owned by the six promoter corpora-

tions of the enterprise. Indeed, according to the map, which was made a part of the information, the entire area including the lakes embraced within the boundaries, exclusive of the so-called "built up" portion of the town covering about one mile square, consists of rural lands and the lands covered by the waters of the lakes.

It is apparent from the allegations of the information that the $200,000 indebtedness proposed or actual bond issue is to be used as follows: $117,000 for a golf course, white way and parks; the golf course to cost $75,000, parks $32,000 and a white way $10,000. The remainder was for fire department $8,000, and water works $70,000. In addition special improvement bonds were issued in the sum of $47,000 to be paid by general taxes. All this ostensibly for the convenience, health and welfare of a "mere village with a few hundred inhabitants." That the lands of the Co-relators are remote from the village of Lake Placid, have not been laid off as a part of the municipality, and are owned and occupied for farming purposes.

It appears from the information also that the officers and employees of the town are drawn from persons interested financially in the corporations promoting the enterprise or as employees of the company and their relations to the town are such as to make the transaction of the town government lose the semblance of municipal government and become transactions with the private corporations promoting the enterprise.

One instance sufficient to illustrate appears in the information. It was proposed to purchase from Lake Placid Land Company, in June, 1927, a golf course and borrow $30,000 to improve it. This proposition, however, was defeated, but later during the year the same property was purchased from the Consolidated Land Company, which became the owner for $74,950, and $25,000 were borrowed from

Lake Placid Land Company for improvement, and this indebtedness to be added to the debt service of the municipality and became an obligation upon the area included within its boundaries.

It is apparent from the allegations of the information that this enterprise resulting in the passage of Chapter 12990, *supra,* attempting to create a municipality had for its purpose, first, the incorporation of a vast area of rural lands and lakes of large area; second, the establishment of a community to be created by advertising and colonization to consist of wealthy people who enjoy and can afford the pleasure of healthful and entertaining sports and outdoor life, while enjoying the comforts of elegantly equipped club houses and other exclusive hostelries; third, the creation of large and beautiful parks and playgrounds for the delectation of the anticipated thousands of persons who may be attracted by advertisements of the proposed Utopia of social regeneration of "cultured Christian people;" fourth, the pecuniary profit of the owners of approximately five-sevenths of the area embraced in the municipal boundaries. To this end the practical control of the municipality's management and debt service creation should be placed within the power of the promoting corporations.

The exercise of the Legislature's vast power in the name of all the people of this State was secured to legalize this undertaking under the name of a municipality.

In the case of West v. Town of Lake Placid, 97 Fla. 127, 120 Sou. Rep. 361, which was an intervention by West and others in a proceeding by the town to validate certain bonds proposed by the municipality, this Court held that in a collateral attack upon the legality of the incorporation, such as the case then before the court, the town would be deemed to be at least "a *de facto* municipality" and such status could

only be challenged by the State in a direct proceeding such as *quo warranto* through the Attorney General or such other person as may be lawfully authorized or entitled by reason of the nature of his rights involved to invoke the remedy, and until it is so challenged and terminated by judgment of ouster it may continue to exercise its powers and discharge its governmental functions.

Approximately two years later the Attorney General and certain Co-relators named, the nature of whose rights involved entitled them to invoke the remedy by *quo warranto* to challenge the legality of the creation of the municipality or the exercise of its municipal authority over their lands and properties, began this proceeding.

Population is essential to the creation of a municipal corporation. The corporate body is composed of inhabitants within the territorial limits of the municipality. While density of population, in the absence of constitutional limitations, is a matter within legislative discretion, it cannot be maintained that the power to establish a municipality may be lawfully exercised where there is no population of a given area or even where the population is absurdly disproportionate in numbers to the area defined by boundaries. There are inherent limitations upon the Legislature in this regard imposed by the use of the phrase "to establish, and to abolish, municipalities," in the Eighth Section of Article VIII of the Constitution. There must exist a village, a community of people, a settlement or a town occupying an area small enough that those living therein may be said to have such social contacts as to create a community of public interest and duty requiring, in consideration of the general welfare, an organized agency for the management of their local affairs of a *quasi* public nature.

The origin and history of the word municipality show be-

yond peradventure of a doubt that two elements are essential to its existence; a community of people, and the territory they occupy. The Legislature can create neither. A third element is also essential under our system of government which is essentially different from the old Roman system under which the word came into existence. That element is: order, the powers to be exercised and defining territorial limits, which did not pertain to the Roman authority except in so far as that government might impose duties and prescribe privileges upon and for the inhabitants of the local *"municipium"* in their relation to the Roman State, whereby they might be accepted and treated as Roman citizens. See 1 McQuillin Municipal Corporations.

The city of ancient Rome is the prototype for all municipalities of modern times. The desire to be in close touch with the glitter of social life and political activity presented problems of overcrowding, bad sanitary conditions, crowding of streets and public places, a condition now most common in even the smallest communities due to the popularity of the automobile and the failure of the local authorities to provide means to prevent the overcrowding and congestion of public thoroughfares, water supply and sanitation, cemeteries and drainage of low and swampy places, public buildings, and baths, were all problems of the ancient "municipia" of the empire of Rome.

These problems arose as the population of the towns or cities increased. So it is apparent that before the legislative will may operate to establish a municipality, that is to say, to prescribe powers and duties for the governance of towns, villages or communities, there must be in existence a town, village or community of people, whose local public interests require, in the orderly processes of government, orderly ad-

ministration under State authority whose agencies they are in a broad sense.

Such is the legislative power meant by the Constitutional phrase "to establish, and to abolish, municipalities." The word "establish" does not have the meaning in this connection of to "create." The words are not synonymous.

The word "establish" in common language has various meanings and the peculiar sense in which it is used in any sentence is to be determined by the context. It may be used as to settle firmly, to fix unalterably, to make a form, to create, to regulate, to settle, or to recognize. See Davenport v. Caldwell, 10 S. C. (10 Rich.) 317.

The word is not limited in its meaning "to found or set up" but is as often employed to signify the putting or fixing on a firm basis or putting in a settled or deficient state or condition and existing legal organization or institution. See State v. Rogers, 107 Ala. 444, 19 Sou. Rep. 909, 32 L. R. A. 520. See also Words and Phrases.

As to the matter of boundaries, in so far as the fixing of territorial limits of a city is included in the power to "establish" municipalities, the history of the subject from the earliest times of the Roman State shows that the territory of a "municipium" embraced the town proper and its adjoining suburbs. See II Roman Law in the Modern World (Sherman) 463. No area more extensive than the outlying part of the town or village proper, a smaller place adjacent to the town or city was included in the boundaries of the city.

A large territory many hundreds of times greater than the vicinity occupied by the inhabitants of a village, including only rural or farm lands, cattle ranges, fruit groves, and forests where the scattered population derives no advantage, benefit, aid or privileges from the local government of the

town proper was never in the history of the subject deemed either necessary, convenient or expedient to local government. Nor does power to establish municipalities embrace the power to designate such areas as boundaries of a municipality in anticipation of the coming of great numbers of people as visitors or permanent residents to enjoy the pleasures proposed to be afforded by development enterprises on the part of private land owners of such areas for profit. Nor may the Legislature, under the power inherent in such body, authorize any city or borough or incorporate district to obtain or appropriate money or lend its credit to any corporation, association, institution or individual. Sec. 10, Art. IX Constitution.

In the case of State v. City of Stuart, 97 Fla. 69, 120 Sou. Rep. 335, text 346, Mr. Justice BROWN, in a learned and forceful opinion expressing the views of this Court, repudiated the doctrine of unlimited power in the Legislature over municipal boundaries. He quoted from Cooley on Taxation as follows:

"But the Legislature has no authority to bring into a municipality territory not contiguous to it and the attempt to do so for the purpose of increasing the municipal revenues may be treated as void."

In that opinion the view was expressed that the "unlimited power" doctrine was not qualified merely by the circumstance of "non-contiguous territory" but there were other limitations existing in the constitutional rights of citizens securing from confiscation, their property without compensation.

The learned judge said: "In some cases the courts have considered themselves warranted in inquiring into facts, in order to determine whether in their judgment the extension of municipal boundaries was fairly warranted" (text 343).

When the courts find that the power was not propertly exer-
cised, the property owners, whose property was thus sub-
jected to unequal taxation, would be protected by the Court
which would declare that the motive which seemed to in-
fluence the legislative action was not legitimate. In the
Stuart case it was held that the information in *quo war-
ranto* made a *prima facie* case for the relief sought by the
Attorney General and the Co-relators, that on the facts
stated the legislative Act extending the boundaries of the
City of Stuart so as to include the considerable body of rural
lands owned by the Co-relators some distance from the city
and beyond the range of municipal benefits contravened
the provisions of the Declaration of Rights protecting the
rights of private property and was an unlawful exercise of
legislative power.

The brief of counsel for Relators contains some startling
comparisons as to population, area, density of population,
natural barriers separating outlying lands from the influence
of municipal improvements, school and community life,
form of government, and present burdens, between the two
municipalities of Stuart and Lake Placid, most favorable to
the former.

In other words, if the conditions in the former case justi-
fied the court in holding that the information disclosed suf-
ficient grounds for the relief sought then the information in
the instant case is abundantly sufficient.

This case affords an even clearer instance of invalid exer-
cise of power than the Stuart case, which was one of exten-
sion of boundaries. Chapter 12990, *supra*, purporting to
incorporate the town of Lake Placid, was not an Act extend-
ing boundaries, but it was one establishing a municipality.
It repealed the Act establishing the town of Lake Stearns
and purported to set up in its place a new government over
three times the territorial area of the former, subjecting

lands far removed from the benefits of the town government or town activities in the matter of streets, lights, water supply, sanitation, sewerage and policing, to taxation not only to pay debts incurred by the town proper, but to carry on development enterprises of rural lands by corporations owning the greater area of outlying territory. From the allegations of the information it is evident that the scheme was one to build an attractive pleasure and health resort, not for persons already living within the area, but for persons who might be drawn thither by the alluring prospects of play grounds and elegant clubs. Undoubtedly the State of Florida affords abundant opportunities for the creation of such resorts for those who have time and wealth to enable them to enjoy their attractions, but that is for private industry and not for legislation under the guise of establishing municipalities.

The Stuart case, *supra,* is determinative of the questions presented here. We are of the opinion that in the Constitutional clause, Art VIII, Sec. 8, providing for the power to "establish, and to abolish, municipalities" there exists limitations upon the Legislative power inherently possessed to establish municipalities; that the clause is not a grant of power, but a limitation upon power restricting its exercise, not only in the matter of government, but the fixing of boundaries to such reasonable exercise that lands rural in character, such as farms, citrus groves, forests and wild unoccupied lands far removed from the actual boundaries of the village to be incorporated and wholly unsuited for any municipal purpose and far removed from any benefits resulting from the incorporation or activities of the municipality proper, shall not be included in the boundaries.

The demurrer to the information should have been overruled. The order is therefore reversed.

432

WHITFIELD, TERRELL, BROWN and BUFORD, J. J., concur.

DAVIS, C. J., disqualified.