**MOBIL OIL CORPORATION et al.,**
**Appellants,**

v.

**LOCAL BOUNDARY COMMISSION of the**
**State of Alaska et al., Appellees.**

**No. 1947.**

Supreme Court of Alaska.

Jan. 16, 1974.

94

H. Russel Holland, Holland & Thornton, Joseph Rudd, Ely, Guess & Rudd, Anchorage, John Lansdale, Jr., Squire, Sanders & Dempsey, Cleveland, Ohio, for appellants.

John E. Havelock, Atty. Gen., Juneau, John A. Reeder, Jr., Asst. Atty. Gen., Charles K. Cranston, Anchorage, David H. Getches, Native American Rights Fund, Boulder, Colo., John W. Hendrickson, Anchorage, for appellees.

Before RABINOWITZ, Chief Justice, CONNOR, ERWIN and FITZGERALD, Justices, and BURKE, Superior Court Judge.

## OPINION

ERWIN, Justice.

This appeal challenges administrative actions by the Local Boundary Commission and the Local Affairs Agency[1] in connection with incorporation of the North Slope Borough.

On April 6, 1971, a petition for incorporation of a first class organized borough was submitted to the Local Affairs Agency by the Arctic Slope Native Association.[2] The petition proposed creation of a North Slope Borough reaching from the Bering Straits below Point Hope eastward to the Canadian border and from the Brooks Range north to the Arctic shore. Within these 87,500 square miles lie the cities of Barrow, Point Hope, Wainwright, Kakto-vik and Anaktuvuk Pass, a total population of less than four thousand, and the oil fields and associated development camps near Prudhoe Bay.

Upon receipt of the petition and pursuant to its duties under AS 07.10.060–.090,[3] the Local Affairs Agency reviewed the petition for proper form and number of signatures[4] and undertook an investigation of its compliance with certain standards for incorporation, composition and apportionment of the borough assembly, and areawide powers set out in AS 07.10.030.-050. The agency submitted a report on its inquiries to the Local Boundary Commission.

The Commission, pursuant to AS 07.10.-100–.110,[5] commenced an additional investi-

1. The Local Boundary Commission is a body mandated by the constitution and made a part of the Local Affairs Agency by statute. Alaska Const. art. X, § 12; AS 44.19.250. The Local Affairs Agency is now designated as the Department of Community and Regional Affairs. Ch. 200, § 9, SLA 1972.

2. Forty-one per cent of the qualified voters of the proposed borough had signed the petition.

3. These statutes provided:
07.10.060. *Review by Local Affairs Agency.* Upon receipt of a petition, the Local Affairs Agency shall immediately proceed with a review of it to determine (1) if the petition is substantially in the proper form and (2) if the petition is signed by the required number of qualified voters.
07.10.070. *Return of petition.* If the Local Affairs Agency determines that the petition is not substantially in the proper form or lacks the minimum number of qualified voters signing the petition, the agency shall not accept the petition but may return it for correction or completion.
07.10.080. *Investigation.* (a) If the Local Affairs Agency determines that the petition is substantially in the proper form and contains the required number of qualified voters' signatures, the agency shall conduct an investigation to determine (1) if the proposed incorporation of the borough, (2) if the proposed composition and apportionment of the borough assembly, and (3) if the proposed assignment of areawide powers meet the standards prescribed by this Act. In investigating the proposed apportionment of the borough assembly, the agency shall use the latest figures of the United States Bureau of the Census. However, if these figures are considered inadequate by the agency because of recent population changes or other limitations in the use of these figures, the agency may use any method necessary to determine most accurately the actual population.
(b) The Local Affairs Agency may combine petitions for incorporation from the same general area whether all or part of the same area is included in the petitions. Petitions shall be investigated in the order deemed advisable by the Local Affairs Agency, and not necessarily in the order received.
07.10.090. *Report to the Local Boundary Commission.* The Local Affairs Agency shall report the findings of its investigation to the Local Boundary Commission together with any recommendations it may have regarding the incorporation of the proposed organized borough, the composition and apportionment of the assembly, and the assignment of areawide powers.
Title 7 was repealed by ch. 118, SLA 1972 in favor of the new Title 29, effective September 10, 1972. Section 3 of the repealer preserved existing rights and duties allowing this appeal to be decided under Title 7.

4. AS 07.10.020.

5. These statutes provided:
07.10.100. *Hearing by Local Boundary Commission.* The Local Boundary Commission shall hold at least one hearing in the area to be incorporated as an organized borough for the purpose of hearing public comment on the proposal for the incorporation of the organized borough, the composition and apportionment of the borough as-

gation. A mandatory hearing was held at Barrow on December 2, 1971, to elicit public comment. On February 23, 24 and 25, 1972, the Commission held a public meeting in Anchorage, heard additional comment, and accepted the petition.[6] This was noticed to the Lieutenant Governor in a document dated February 25, 1972. And on March 28, 1972, a group of eleven corporations and individuals filed the petition for judicial review which has led to this appeal.[7]

These corporations and individuals are holders of surface leases and owners of interests in oil and gas wells and other real and personal property in the area of Prudhoe Bay. In the superior court, they sought a declaratory judgment against the Local Boundary Commission, the Lieutenant Governor and the state holding the incorporation invalid. The five incorporated cities within the borough, two residents of the area, the Arctic Slope Native Association and the North Slope Borough were permitted to intervene as defendants. After motions for summary judgment by all parties were denied, the superior court upheld acceptance of the petition, finding, *inter alia,* that the investigations of the Local Affairs Agency and the Local Boundary Commission were consistent with procedural due process, that inclusion of the plaintiffs'

property within the borough did not deny substantive due process, and that the evidence assembled gave substantial ssupport to the Commission's action. The defendants were awarded $20,000.00 attorneys' fees. From the judgment affirming the Commission and the order awarding attorneys' fees, all plaintiffs below appeal.

The property owners challenge the procedures of the administrative agencies, the scope of review applied by the superior court and the adequacy of the evidence supporting organization of the North Slope Borough. They raise the following arguments: (1) the Local Boundary Commission did not produce required findings of fact; (2) the superior court should not have deferred to the Commission's interpretation of the statutory criteria for incorporation; (3) acceptance of the borough petition was not supported by substantial evidence; (4) inclusion of the plaintiffs' property within the borough denied them substantive due process; (5) the accepted incorporation petition should have been submitted to the legislature; and (6) attorneys' fees should not have been awarded to the prevailing parties.

## I. FINDINGS OF FACT

■ AS 07.10.110 permits judicial review of the Commission's acceptance of an

sembly, the assignment of areawide powers, and the location of borough boundaries. 07.10.110. *Determination by Local Boundardy Commission.* After considering the findings of the Local Affairs Agency and the comments at the public hearing, the Local Boundary Commission shall determine if the petition is to be accepted. If the commission determines that the proposed organized borough fails to meet the standards for incorporation or the composition and apportionment of the assembly prescribed by this Act, the commission shall reject the petition. If the commission determines that the proposed organized borough meets the standards for incorporation and the composition and apportionment of the assembly prescribed by this Act, the commission shall accept the petition. If the Local Boundary Commission determines that the proposed organized borough would meet the standards prescribed by this Act, if changes were made in the composition and

apportionment of the borough assembly, the boundaries of the proposed borough, or the areawide powers to be exercised by the proposed borough, the commission may change the boundaries of the proposed organized borough or the composition and apportionment of the borough assembly or the areawide powers of the proposed organized borough and accept the petition. Any person aggrieved by any determination of the Commission may appeal to the Superior Court in the manner and within the scope of review prescribed by Sections 24 and 25, Ch. 2, of the Administrative Procedure Act (AS 44.62).

6. The Commission, exercising its authority under AS 07.10.110, granted the borough only the mandatory areawide powers of education, land use planning and taxation.

7. Review by the superior court was authorized by AS 07.10.110.

incorporation petition "in the manner and within the scope of review prescribed by Sections 24 and 25, Ch. 2, of the Administrative Procedure Act (AS 44.62)." We do not accept appellants' contention that this language, read together with AS 44.-62.510,[8] creates an obligation on the part of the Local Boundary Commission to make findings of fact. The sections of the Administrative Procedure Act invoked are 44.62.560–44.62.570 [9] which prescribe the manner and scope of judicial review but do not address the form of the agency's determinations. The latter was set out in AS 07.10.110 without imposition of a duty to produce findings. If these were to be required by the Administrative Procedure Act, the obligation could be expected to have been imposed in the same manner as it has been placed upon other agencies; that is, by listing the Local Boundary Commission among the administrative bodies subjected by AS 44.62.330(a) to certain procedural requirements, including the duty in AS 44.62.510 to prepare written findings of fact, or by expressly imposing such a duty in a statute relating to the Commission.[10] The Local Boundary Commission is not named, nor does any part of Title 7 require findings. Given this framework, we find no statutory command that findings of fact accompany acceptance of a petition for borough incorporation.

■ The special function of the Commission, to undertake a broad inquiry into the desirability of creating a political subdivision of the state, makes us reluctant to impose an independent judicial requirement that findings be prepared.[11] From our own review of the entire record of this controversy, we have been able to determine the basis of the Commission's decision,[12] and we have concluded that its proceedings and review by the superior court have been consistent with sound principles of administrative law.

## II. SCOPE OF REVIEW

■ Appellants attack the scope of the superior court's review of the Commis-

8. The statute provides in part:
    (a) A decision shall be written and shall contain findings of fact, a determination of the issues presented and the penalty, if any. The findings may be stated in the language of the pleadings or by reference to them. Copies of the decision shall be delivered to the parties personally or sent to them by registered mail.

9. AS 44.62.570 provides in part:
    (a) An appeal shall be heard by the superior court sitting without a jury.
    (b) Inquiry in an appeal extends to the following questions: (1) whether the agency has proceeded without, or in excess of jurisdiction; (2) whether there was a fair hearing; and (3) whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in the manner required by law, the order or decision is not supported by findings, or the findings are not supported by the evidence.
    (c) The court may exercise its independent judgment on the evidence. If it is claimed that the findings are not supported by the evidence, abuse of discretion is established if the court determines that the findings are not supported by (1) the weight of the evidence, or (2) substantial evidence in the light of the whole record.

    (d) The court may augment the agency record in whole or in part, or hold a hearing de novo. If the court finds that there is relevant evidence which, in the exercise of reasonable diligence, could not have been produced or which was improperly excluded at the hearing, the court may (1) enter judgment as provided in (e) of this section and remand the case to be reconsidered in the light of that evidence; or (2) admit the evidence at the appellate hearing without remanding the case.
    We have have previously held that in areas of agency expertise or fundamental policy formulation the proper standard on review is whether the agency action has a reasonable basis. *E. g.*, Swindel v. Kelly, 499 P.2d 291, 298 (Alaska 1972). The standard appropriate for this appeal is discussed at Part II, *infra*.

10. AS 44.62.330(b).

11. We recognize that in the usual case findings of fact would be required even in the absence of a statutory duty in order to facilitate judicial review, insure careful administrative deliberation, assist the parties in preparing for review, and restrain agencies within the bounds of their jurisdiction. See 2 K. Davis, Administrative Law Treatise § 1605 at 446–48 (1958).

12. *Cf.* K & L Distributors, Inc. v. Murkowski, 486 P.2d 351, 359–360 (Alaska 1971).

sion's action, contending that the court accorded undue deference to the Commission when it declined to undertake independent interpretation of the standards for incorporation.[13] We disagree. Recent cases have established that where administrative action involves formulation of fundamental policy, the appropriate standard on review is whether the agency action has a reasonable basis. Swindel v. Kelly, 499 P. 2d 291, 298 (Alaska 1972); Kelly v. Zamarello, 486 P.2d 906, 911 (Alaska 1971); Pan American Petroleum Corporation v. Shell Oil Company, 455 P.2d 12, 21–23 (Alaska 1969). A determination whether an area is cohesive and prosperous enough for local self-government involves broad judgments of political and social policy. The standards for incorporation set out in AS 07.10.030 were intended to be flexibly applied to a wide range of regional conditions. This is evident from such terms as "large enough", "stable enough", "conform generally", "all areas necessary and proper", "necessary or desirable", "adequate level" and the like. The borough concept was incorporated into our constitution in the belief that one unit of local government could be successfully adapted to both urban and sparsely populated areas of Alaska,[14] and the Local Boundary Commis-

---

13. Criteria for incorporating an organized borough were set forth in AS 07.10.030 which provided:

*Standards for incorporation.* No area may be incorporated as an organized borough unless it conforms to the following standards.

(1) The population of the area proposed for incorporation shall be interrelated and integrated as to its social, cultural, and economic activities. The population shall be qualified and willing to assume the duties arising out of incorporation, shall have a clear understanding of the nature of the undertaking for which they ask, and shall be large enough and stable enough to warrant and support the operation of organized borough government.

(2) The boundaries of the proposed organized borough shall conform generally to the natural geography of the area proposed for incorporation, shall include all areas necessary and proper for the full development of integrated local government services, but shall exclude all areas such as military reservations, glaciers, icecaps, and uninhabited and unused lands unless such areas are necessary or desirable for integrated local government.

(3) The economy of the proposed organized borough shall encompass a trading area with the human and financial resources capable of providing an adequate level of governmental services. In determining the sufficiency and stability of an area's economy, land use, property valuations, total economic base, total personal income, present and potential resource or commercial development, anticipated functions, expenses, and income of the proposed organized borough, shall be considered.

(4) The transportation facilities in the area proposed for incorporation shall be of such a unified nature as to facilitate the communication and exchange necessary for the development of integrated local government and a community of interests. Means of transportation may include surface (both water and land) and air. Areas which are accessible to other parts of a proposed organized borough by water or air only may not be included within the organized borough unless access to them is reasonably inexpensive, readily available, and reasonably safe. In considering the sufficiency of means of transportation within a proposed organized borough, existing and planned roads and highways, air transport and landing facilities, boats and ferry systems, and railroads, shall be included.

Only satisfaction of paragraph (2), the geography standard, and (4), the transportation standard, are at issue in this appeal.

14. A summary by the local government committee at the constitutional convention of the principles underlying the borough concept is preserved in T. Morehouse & V. Fischer, Borough Government in Alaska at 63–64 (1971). This relates:

*Self-government*—The proposed article bridges the gap now existing in many parts of Alaska. It opens the way to democratic self-government for people now ruled directly from the capital of the territory or even Washington, D.C. The proposed article allows some degree of self-determination in local affairs whether in urban or sparsely populated areas. . . .

. . . . .

*Flexibility*—The proposed article provides a local government framework adaptable to different areas of the state as well as to changes that occur with the passage of time.

. . .

The authors describe how evolution of the borough has reflected this intended flexibility.

[T]wo recognizable types of organized boroughs now exist in Alaska: the *regional*

sion has been given a broad power to decide in the unique circumstances presented by each petition whether borough government is appropriate. Necessarily, this is an exercise of delegated legislative authority to reach basic policy decisions. Accordingly, acceptance of the incorporation petition should be affirmed if we perceive in the record a reasonable basis of support for the Commission's reading of the standards and its evaluation of the evidence.

■ The appellants argue that neither the geography nor the transportation standard is satisfied by the record evidence. Our review of the record has been undertaken in light of the statement of purpose accompanying article X, the local government article, of the Alaska constitution. Section 1 declares in part:

> The purpose of this article is to provide for maximum local self-government with a minimum of local government units, and to prevent duplication of tax-levying jurisdictions. . . .

We read this to favor upholding organization of boroughs by the Local Boundary Commission whenever the requirements for incorporation have been minimally met.

■ The geography standard, AS 07.-10.030(2), provided that borough boundaries are to "conform generally to the natural geography of the area" and "include all areas necessary and proper for the full development of integrated local government services." However, "all areas such as military reservations, glaciers, ice caps,

and uninhabited and unused lands" are to be excluded "unless such areas are necessary or desirable for integrated local government." The property owners point out that the borough encompasses Naval Petroleum Reserve No. 4 [15] and argue that its inclusion cannot be justified as "necessary or desirable for integrated local government" because the Reserve is within the exclusive jurisdiction of the federal government leaving the borough powerless to regulate its use. In re Long's Petition, 200 F.Supp. 313 (D. Alaska 1961), leads us to a contrary conclusion. On a petition for a writ of habeas corpus, the district court was required to decide whether an alleged burglary committed within the boundaries of Naval Petroleum Reserve No. 4 could be prosecuted under Alaska law. Following a thorough review of the original order creating the Reserve,[16] the Alaska Statehood Act and its legislative history,[17] the court concluded that the state had been granted concurrent jurisdiction over the Reserve until Congress enacts legislation to the contrary.[18] We accept this reading as sound and see no impediment to the state's partial delegation of its concurrent authority to a political subdivision. This question of jurisdiction aside, the superior court properly concluded that the record evidence of the Reserve's importance to the subsistence lifestyle of area residents showed inclusion of the tract to be desirable for integrated local government so that it might fall within the new borough's planning and zoning power. This reasonably satisfies the geography standard.

borough, generally covering an extensive area including several widely dispersed small communities, incorporated and unincorporated, and the *urban borough*, having a population concentrated primarily in a single urban core area, characteristically overspilling the boundaries of a central city. It could be anticipated that the local governmental system will evolve in the two directions of unification and regionalism associated with these basic physical and socio-economic patterns.

*Id.* at 107–09 (emphasis in original).

15. The Reserve occupies 23 million acres, forty-seven per cent of the borough's total area. The Point Lay Military Reserve, covering three thousand acres, is also within the borough.

16. Exec.Order No. 3797–A (1923).

17. 72 Stat. 339 (1958); S.Rep.No.1163, 85th Cong., 2d Sess. (1958); H.R.Rep.No.624, 85th Cong., 2d Sess. (1958); Hearings on S. 50 before the Committee on Interior and Insular Affairs, 83d Cong., 2d Sess. (1954).

18. This conclusion is also reached in Enforcement of State Fish and Game Laws on Military Reservations, 1964 Op.Alaska Att'y. Gen. No. 2.

We are also satisfied that the transportation standard has been reasonably met. The dispute surrounds the language of AS 07.10.030(4):

> The transportation facilities in the area proposed for incorporation shall be of such a unified nature as to facilitate the communication and exchange necessary for the development of integrated local government and a community of interests. Means of transportation may include surface (both water and land) and air. Areas which are accessible to other parts of a proposed organized borough by water or air only may not be included within the organized borough unless access to them is reasonably inexpensive, readily available, and reasonably safe. In considering the sufficiency of means of transportation within a proposed organized borough, existing and planned roads and highways, air transport and landing facilities, boats and ferry systems, and railroads, shall be included.

Regular travel among borough communities is available only by charter aircraft. Surface transportation is limited to dog teams and snowmachines. Even at this stage of development, we agree with the superior court that the Commission could reasonably have found travel facilities adequate to support borough government when present and future capacity is considered in the context of transportation in Alaska generally and compared to the present cost and availability of travel to centers of government which affect the lives of North Slope residents.

## III. SUBSTANTIVE DUE PROCESS

By concluding that the Commission's application of the geography and transportation standards was reasonable, we reach the contention that inclusion of the plaintiff's property at Prudhoe Bay within the North Slope Borough is a denial of substantive due process. In support of this proposition, the property owners offer a series of cases striking down municipal annexations and incorporations where the lands taken have been found to receive no benefit.[19] We find this authority unpersuasive when applied to borough incorporation. In most of these cases, the courts inferred from statutes or state constitutions what has been called a "limitation of community"[20] which requires that the area taken into a municipality be urban or semi-urban in character.

> There must exist a village, a community of people, a settlement or a town occupying an area small enough that those living therein may be said to have such social contacts as to create a community of public interest and duty. . . .[21]

The limitation has been found implicit in words like "city" or "town" in statutes and constitutions[22] or inferred from a general public policy of encouraging mining or agriculture.[23] In other cases, the limitation has been expressed as a finding that the land taken is not susceptible to urban mu-

19. The property owners rely principally upon United States v. City of Bellevue, Nebraska, 474 F.2d 473 (8th Cir. 1973); State ex rel. Attorney General v. City of Avon Park, 108 Fla. 641, 149 So. 409 (1933); State ex rel. Davis v. City of Stuart, 97 Fla. 69, 120 So. 335 (1929); City of Aurora v. Bryant, 240 Ind. 492, 165 N.E.2d 141 (1960); State v. Village of Leetonia, 210 Minn. 404, 298 N.W. 717 (1941); Portland General Electric Co. v. City of Estacada, 194 Or. 145, 241 P.2d 1129 (1952).

20. 1 C. Antieau, Municipal Corporation Law § 1.04 (1973).

21. State ex rel. Davis v. Town of Lake Placid, 109 Fla. 419, 147 So. 468, 471 (1933).

22. E. g., Town of Satellite Beach v. State, 122 So.2d 39 (Fla.App.1960); State v. Town of Boynton Beach, 129 Fla. 528, 177 So. 327 (1937); State ex rel. Davis v. City of Largo, 110 Fla. 21, 149 So. 420 (1933); State ex rel. Attorney General v. City of Avon Park, 108 Fla. 641, 149 So. 409 (1933); State ex rel. Davis v. City of Stuart, 97 Fla. 69, 120 So. 335 (1929); Chesapeake and O. Ry. v. City of Silver Grove, 249 S.W.2d 520 (Ky. 1952); Portland General Electric Co. v. City of Estacada, 194 Or. 145, 241 P.2d 1129 (1952).

23. E. g., State ex rel. Bibb v. City of Reno, 64 Nev. 127, 178 P.2d 366 (1947).

nicipal uses.[24] The result in these cases was determined not by a test of due process but by restrictions in pertinent statutes and constitutions on the reach of municipal annexations and incorporations.

Aside from the standards for incorporation in AS 07.10.030, there are no limitations in Alaska law on the organization of borough governments. Our constitution encourages their creation. Alaska const. art. X, § 1. And boroughs are not restricted to the form and function of municipalities. They are meant to provide local government for regions as well as localities and encompass lands with no present municipal use.[25] For these reasons, the municipal cases relied upon by the property owners are poor guides to resolving whether organization of an Alaskan borough violates substantive due process.

Appellants also direct us to Myles Salt Co., Ltd. v. Board of Commissioners, 239 U.S. 478, 36 S.Ct. 204, 60 L.Ed. 392 (1916), which found creation of a drainage district to violate due process in the absence of a benefit to property within its boundaries; but the case is of limited application to this appeal. It involved a Louisiana landowner's objection to taxes levied to protect lands within the drainage district from tidal overflows. Myles Salt Company owned an island with the highest uniform elevation in southwest Louisiana, so that it suffered erosion and excessive drainage but not flooding. Taking the allegations of the company as true, the Supreme Court held that forced payment of assessments for drainage which would never benefit Myles Salt Company would constitute a denial of due process.

We feel three characteristics of this case warrant our attention. The question of law upon which the case turned was whether organization of the drainage district was "palpably arbitrary and a plain abuse" of the state's broad power to create special service districts.[26] We agree that the test of substantive due process is whether the action of the legislature must be said to be arbitrary.[27] Judicial concern for whether a statute comports with substantive due process goes no farther than a perception that the act furthers a legitimate governmental purpose. The question of benefit is not irrelevant, but it is only a part of the more general inquiry into arbitrariness. Because Myles Salt came before the Supreme Court on appeal from a dismissal for failure to state a cause of action, whether the district's boundaries were arbitrary turned upon only the allegations of the complaint. This narrowed the court's inquiry to benefit from drainage alone; other reasons for creating the district were disregarded.

> Nothing could be more arbitrary if drainage alone be regarded. But there may be other purposes, defendants say, and, besides, that the benefit to the property need not be direct or immediate; it may be indirect, such as might accrue by reason of the general benefits derived by the surrounding territory. But such benefit is excluded by the averments . . . .[28]

Moreover, the entity under attack was a drainage district and not a unit of government.

> It is to be remembered that a drainage district has the special purpose of the improvement of particular property, and when it is so formed to include property which is not and cannot be benefited directly or indirectly, including it only that it may pay for the benefit to other prop-

---

24. *E. g.*, City of Sugar Creek v. Standard Oil Co., 163 F.2d 320 (8th Cir. 1947) ; Waldrop v. Kansas City Southern Ry. Co., 131 Ark. 453, 199 S.W. 369 (1917) ; City of Aurora v. Bryant, 240 Ind. 492, 165 N.E.2d 141 (1960) ; State v. Village of Leetonia, 210 Minn. 404, 298 N.W. 717 (1941).

25. See note 14, *supra.*

26. 239 U.S. at 481, 36 S.Ct. at 205, 60 L.Ed. at 395.

27. *See, e. g.*, Nebbia v. New York, 291 U.S. 502, 525, 54 S.Ct. 505, 78 L.Ed. 940, 950 (1934).

28. 239 U.S. at 484, 36 S.Ct. at 206, 60 L.Ed. at 396.

erty, there is an abuse of power and an act of confiscation.[29]

As exampled below, there may be acceptable public purposes which justify creation of a body of government but do not confer a felt benefit upon particular property owners. The lesson of *Myles Salt* which survives generalization from its particular facts to this appeal is only the familiar principle that the legislature may not act arbitrarily.

■ We can perceive why the legislature might authorize organization of a North Slope borough. As an example, private developers at Prudhoe Bay may gear their investments in the design and construction of camps, roads, airports and the like for a maximum return over the projected life of the surrounding oil fields. The state, on the other hand, may prefer development of the surface with a view to its long-run utility as a permanent arctic community. Need for the state to oversee the course of private development could be met by a local government body which promulgates and enforces planning and zoning regulations.[30]

■ The uncontested ability of the property owners to supply many of the services which the North Slope Borough is empowered to provide is not relevant to the question of due process. Judicial inquiry does not reach whether incorporation is desirable. The state may reasonably conclude that private development interests

do not align with the public interest, that the economic motivating co-ordinated development may evolve in time to favor independent action by the property owners, and that, for example, an active planning and zoning authority in the form of a borough would assure that private agreements and intentions do not waiver and development diverge from the long-range interests of North Slope residents and the state.

## IV. APPROVAL OF THE PETITION BY THE LEGISLATURE

■ The property owners also argue that the accepted incorporation petition should have been submitted by the Local Boundary Commission to the legislature. They contend this course is required by article X, section 12 of the Alaska constitution which provides:

> *Boundaries.* A local boundary commission or board shall be established by law in the executive branch of the state government. *The commission or board may consider any proposed local government boundary change. It may present proposed changes to the legislature during the first ten days of any regular session.* The change shall become effective forty-five days after presentation or at the end of the session, whichever is earlier, unless disapproved by a resolution concurred in by a majority of the members of each house. The commission or board, subject to law, may establish pro-

---

**29.** *Id. Compare* State ex rel. Pan American Production Co. v. Texas City, 157 Tex. 450, 303 S.W.2d 780, 783 (1957).

We note that the Supreme Court had previously held matters of local government organization to be within the absolute discretion of the state. No question of federal due process could be raised. Hunter v. City of Pittsburgh, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907). *Myles Salt* did not disturb this holding. It has been narrowed by subsequent voting rights cases, *e. g.*, Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed. 2d 663 (1962); Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), to permit annexations to be attacked on equal protection and right to vote theories; but the substantive due process holding remains in-

tact. Deane Hill Country Club, Inc. v. City of Knoxville, 379 F.2d 321 (6th Cir.), cert. denied, 389 U.S. 975, 88 S.Ct. 476, 19 L.Ed.2d 467 (1967); Detroit Edison Co. v. East China Township School District No. 3, 247 F.Supp. 296 (E.D.Mich.1965), aff'd, 378 F.2d 225 (6th Cir.), cert. denied, 389 U.S. 932, 88 S.Ct. 296, 19 L.Ed.2d 284 (1967).

**30.** We can further perceive that the residents of the North Slope may wish to exercise local control over education and the construction of local schools. While such an activity might not appeal in any way to those engaged in industrial development of the oil resource, local education has been a strongly contested issue between Indian and Eskimo people and the Bureau of Indian Affairs for a number of years.

cedures whereby boundaries may be adjusted by local action. (emphasis added) Organization of a borough involves a boundary change, in their view, because the entire state is divided into several organized and one residual unorganized borough.[31] Creation of an organized borough necessarily changes the boundaries of the unorganized borough. They then read the language of section 12 to confer upon the Local Boundary Commission power to consider the incorporation petitions but not to approve them without submission to the legislature. Supporters of the borough respond by asserting that the power to create boroughs derives from section 3 of article X. This provides:

*Boroughs.* The entire State shall be divided into boroughs, organized or unorganized. They shall be established in a manner and according to standards provided by law. The standards shall include population, geography, economy, transportation, and other factors. Each borough shall embrace an area and population with common interests to the maximum degree possible. The legislature shall classify boroughs and prescribe their powers and functions. *Methods by which boroughs may be organized, incorporated, merged, consolidated, reclassified, or dissolved shall be prescribed by law.* (emphasis added)

The borough's supporters assert that because the legislature delegated the power of incorporation to the Local Boundary Commission through Title 7 without reserving any power of review the Commission's decision need not be submitted to the legislature. We agree. Section 3 vests in the legislature power to prescribe procedures for borough incorporation without restriction. The framework of Title 7 and the past conduct of the Local Boundary Commission persuade us that both the legislature and the agency charged with organizing boroughs have adopted this construction. The only legislative reservation in Title 7 was addressed to adjustments made by the Commission in boundaries of organized boroughs.[32] By its term, AS 07.10.020 did not apply to the act of incorporation. It required a local election on the question of borough organization after acceptance of the petition by the Local Boundary Commission and provided that, upon certification of a majority of votes in favor of organization, the Lieutenant Governor "shall declare that the area . . . is an organized borough".[33] No duty to seek or await legislative approval of the petition was interposed.[34]

Aside from the powers granted by article X, section 3, the weakness of appellants' argument that section 12 requires submission of the accepted incorporation petition to the legislature lies in their equation of the boundary changes contemplated by section 12 with the unavoidable diminution of the residual unorganized borough whenever a functioning borough government is created. Oesau v. City of Dil-

---

31. AS 07.05.010, now AS 29.03.010, provided: All areas in the state which are not within the boundaries of an organized borough constitute a single unorganized borough.
See Alaska const. art. X, § 3, in the text accompanying this note.

32. AS 07.10.125 provided:
*Boundary adjustments.* (a) The Local Boundary Commission may hold public hearings in each area incorporated as an organized borough to determine the necessity for boundary adjustments.
(b) Boundary adjustments may include expanding the boundaries, contracting the boundaries, dividing the areas into two or more areas, or combining two or more areas.
(c) Boundary adjustments made by the Local Boundary Commission shall be submitted to the legislature during the first 10 days of a regular session. The boundary adjustments become effective 45 days after presentation or at the end of the session, whichever is earlier, unless disapproved by a resolution concurred in by a majority of the members of each house.

33. AS 07.10.120(f).

34. In addition, the Local Boundary Commission previously organized two boroughs without submitting the petitions to the legislature; these were the Bristol Bay Borough, in 1962, and the Haines Borough, in 1968. This establishes a pattern of interpretation by the bodies charged with implementing article X which we will not overrule except for weighty reasons. Whaley v. State, 438 P.2d 718, 722 (Alaska 1968).

lingham, 439 P.2d 180, 183–184 (Alaska 1968), established that

> [t]he basic purpose for creating the boundary commission and conferring upon it the powers that it possesses was to obviate the type of situation . . . where there was a controversy over municipal boundaries which apparently could not be settled at the local level.[35]

In this appeal, the superior court correctly determined that this policy does not reach creation of an organized borough from the nonfunctioning unorganized borough. The court observed:

> No allocation of assets or liabilities, and no apportionment of the tax burden to be borne by property owners in the two areas resulting from borough organization is involved. There is no problem respecting apportionment of continuing debt service to existing bond holders. The organized borough, if it comes into being, will merely fill a governmental vacuum now existing.

Carving a new unit of government from the unorganized borough generates no controversy between governments with competing economic and political interests. The conflicts accompanying boundary adjustments between two functioning governments which must be submitted to the legislature under section 12 do not afflict mere incorporation.

Nor is the constitutional history to which we are directed by the property owners persuasive. The single relevant remark is ambiguous and inconclusive on this point. In the debate on adoption of article X before the full convention, Delegate Doogan commented:

> The reason that [section 12] was put in like this was that many times between local government areas they will, by agreement, make boundary changes. These changes, as it is written of necessity, must have the approval of the commission and then again be presented to the legislature. . . . In all cases, any changes that are made must be submitted to the legislature.[36]

Mention of agreements between two existing local governments to adjust mutual boundaries vitiates whatever force the board references in the debate to "all cases" might have in resolving whether incorporation petitions must be submitted to the legislature. The convention simply did not address the question. Accordingly, we adopt the view of the superior court, the legislature and the Local Boundary Commission and hold that submission of an accepted incorporation petition to the legislature is not required by the state constitution.

## V.  ATTORNEYS' FEES

■■■■■ Finally, the property owners contend that the superior court's award of $20,000 attorneys' fees to the prevailing parties was improper. Such award is permitted by Alaska Rule of Civil Procedure 82(a) and will not be set aside absent an abuse of discretion.[37] Appellants ask that we declare the award in this case to be an abuse of discretion as a matter of law because the public interest is involved. Their argument relies on the premise that fear of incurring this expense will deter a citizen from litigating questions of general interest to the community. Because the sums at stake in this controversy are large enough to prompt a suit without consideration of the public interest, the superior court could have concluded that the property owners were acting in their private interests and not in behalf of the public. Under the circumstances, we decline to hold that the award of attorneys' fees in this case amounted to an abuse of discretion.

The decision of the superior court is affirmed.

BOOCHEVER, J., not participating.

---

35. *Accord,* Fairview Public Utility District No. 1 v. City of Anchorage, 368 P.2d 540 (Alaska 1962).

36. 4 Proceedings of the Constitutional Convention at 2751 (1956).

37. *E. g.,* Jefferson v. City of Anchorage, 513 P.2d 1099, 1103 (Alaska 1973); Dale v. Greater Anchorage Area Borough, 439 P.2d 790, 793 (Alaska 1968).