**ALASKA TRANSPORTATION COMMISSION, Appellant,**

v.

**AIRPAC, INC., Appellee.**

**No. 7587.**

Supreme Court of Alaska.

July 27, 1984.

G. Charles Schmidt, Jr., Asst. Atty. Gen., Anchorage, Norman C. Gorsuch, Atty. Gen., Juneau, for appellant.

Steven R. Porter, Roberts & Shefelman, Anchorage, for appellee.

Arthur R. Hauver, Law Office of Arthur R. Hauver, Anchorage, for amicus curiae Reeve Aleutian Airways, Inc.

## OPINION

Before BURKE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and MOORE, JJ.

MOORE, Justice.

This case involves the interpretation of AS 02.05.050(d)(5) and AS 02.05.250(7) and (10) of the Air Commerce Act.[1] The primary issue is whether a "supplemental base of operations" as defined in AS 02.05.-250(10) is required to be certified by the Alaska Transportation Commission. AS 02.05.050(d)(5) only states that a "base of operations" need be certified. We hold that AS 02.05.050(d)(5) does require certification of both supplemental bases of operation and bases of operations; however, we interpret the meaning of "supplemental bases" differently than the Alaska Transportation Commission has interpreted it.

## I. Facts

AIRPAC, the appellee, is an air taxi operator who was authorized by the Alaska Transportation Commission (hereinafter "ATC") to maintain bases of operations at Dutch Harbor and at Akutan. AIRPAC was never authorized to have a base or supplemental base of operations in Anchorage.

In September, 1980, AIRPAC began making frequent charter flights between Dutch Harbor and Anchorage. During the second quarter of 1981, AIRPAC flew 87 flights between Dutch Harbor and Anchorage.[2] The aircraft which services the Anchorage-Dutch Harbor route spent approximately 80% of its time in Anchorage.[3] While in Anchorage, the AIRPAC aircraft was often parked next to the air taxi terminal at the Anchorage International Airport. A majority of AIRPAC's pilots lived in Anchorage. AIRPAC advertised its An-

1. AS 02.05.050(d)(5) provides in pertinent part:
 Authority to engage in air commerce.
 (d) Air taxi operators.... A person authorized under AS 02.05.010–02.05.260 to engage in air commerce as an air taxi operator
 ....
 (5) shall establish and register with the commission, on forms furnished by the commission, his base of operations; however, no air taxi operator may operate from more than one base of operations except upon approval of the commission after a finding that the air taxi operator is fit, willing, and able to provide the additional service.
 AS 02.05.250(7) provides:
 "base of operations" means the point, together with the reasonably contiguous or closely related surrounding community or geographical area, from which the carrier represents to the public that it engages in air commerce, and at where it stations its aircraft, has its facilities and generally conducts its business as an air carrier;
 and AS 02.05.250(10) provides:
 "supplemental base of operations" means the point together with the reasonable contiguous or closely related surrounding community or geographical area, from where, in addition to its "base of operations," the carrier also represents that it engages in air commerce.

2. During this period, AIRPAC flew a total of 744 flights which includes the 174 flights (or 87 round trip flights) between Anchorage and Dutch Harbor.

3. The record indicates that AIRPAC has at least one other aircraft.

chorage telephone number in the Bally-Hoo Herald, a Dutch Harbor newspaper.

In addition to these activities, during the second quarter of 1981 AIRPAC had a full-time employee, Ms. Robinson, who worked solely in Anchorage. Ms. Robinson was hired by AIRPAC to work in Anchorage to relieve certain problems AIRPAC was having in Dutch Harbor. Because of unreliable telephone service in Dutch Harbor, Ms. Robinson was hired to receive calls from AIRPAC customers and to relay information and requests to the Dutch Harbor office.

AIRPAC customers experienced difficulty locating AIRPAC's aircraft upon arrival at the Anchorage International Airport. Since AIRPAC could not have a ticket center (as it did not have an authorized base of operations in Anchorage), and since it used an air taxi facility outside the airport terminal, Ms. Robinson was requested to meet customers to connect them to AIRPAC flights. Ms. Robinson was also hired to help obtain office supplies and aircraft parts which were not generally available in Dutch Harbor.

An ATC agent in Anchorage, using an assumed name, contacted Ms. Robinson by telephone and requested her assistance in making his travel arrangements. Also while in Anchorage, Ms. Robinson was approached by another agent who did not identify himself as an agent for the Commission. When asked by the agent how AIRPAC advertised its services to Dutch

Harbor, Ms. Robinson stated that "we only advertise by word of mouth" because there was some problem about getting certification. She gave the agent the AIRPAC telephone number in Anchorage to call regarding sending packages to Dutch Harbor.

Because of AIRPAC's activities in Anchorage, the staff of the ATC filed an accusation charging that AIRPAC had maintained a base or supplemental base of operations at Anchorage without authorization in violation of AS 02.05.050(d)(5). A hearing based on the staff accusation was held before a hearing examiner on September 3, 1981. On November 2, 1981, the ATC issued a final order finding that AIRPAC had operated from an *unauthorized supplemental* base of operations for the entire second quarter of 1981, and it assessed civil penalties against AIRPAC. AIRPAC then moved for reconsideration of this order on November 20, 1981. The motion for reconsideration was granted by the ATC on November 27, 1981. On March 18, 1982, the ATC entered a final order affirming its prior order after reconsideration.[4] AIRPAC timely filed a notice of appeal to the superior court.

Before the superior court, AIRPAC raised several arguments, which included: (1) that AS 02.05.050(d)(5) does not prohibit air taxi operators from establishing supplemental bases at will; (2) that AS 02.05.050(d)(5) is unconstitutionally vague; (3)

---

**4.** Findings of fact and conclusions of law reached by the examiner included:

 28. That the presence of an Airpac employee at Anchorage willing to make arrangements to ship freight from Anchorage to Dutch Harbor during the entire second quarter of 1981 was a "representation" that Airpac engaged in air commerce at Anchorage and constitutes a "holding out" at Anchorage.

 29. That the advertisement for Airpac in the April 15, 1981, edition of the Bally Hoo Herald is sufficient by itself to support a conclusion that Airpac established, maintained, and operated from a supplemental base of operations at Anchorage without authority to do so during the second quarter of 1981.

 30. That the maintenance of an Anchorage telephone number for Airpac and the presence of an Airpac employee at that number is

sufficient by itself to support a conclusion that Airpac established, maintained, and operated from a supplemental base of operations at Anchorage without authority to do so during the second quarter of 1981.

 31. That the sustained presence of Airpac's aircraft in Anchorage on a daily or virtually daily basis is sufficient by itself to support a conclusion that Airpac established, maintained, and operated from a supplemental base of operations at Anchorage without authority to do so during the entire second quarter of 1981.

 . . . . .

 34. That "holding out" and "representation" can include informal action such as word-of-mouth advertising performed by Ms. Robinson.

that AS 02.05.050(d)(5) infringes upon AIR-PAC's freedom of speech; (4) that AIRPAC did not maintain a supplemental base of operations in Anchorage for the second quarter of 1981; (5) that the ATC had exceeded its authority in levying its civil penalty against AIRPAC; and (6) that the civil penalty levied was not supported by the evidence.

The superior court issued its judgment on February 3, 1983. The superior court agreed with AIRPAC, and reversing the decision of the ATC, and held that AS 02.05.050(d)(5) does not prohibit an air carrier from operating out of a supplemental base of operations without ATC authorization. Thus, only a base of operations must be authorized.[5] The court found it unnecessary to pass upon AIRPAC's five other grounds for reversal. The ATC filed a notice of appeal to this court on March 7, 1983.

II. *The Independent Judgment Test Is the Proper Standard of Review of the Hearing Examiner's Order.*

■ The ATC argues that this court should use the "reasonable basis test" to review the hearing examiner's decision in the instant case. Although the ATC recognizes that "the question before this court is one of statutory construction," the ATC asserts that "the question of whether one may operate a supplemental base of operations without prior approval is a matter of fundamental policy concern which goes to the integrity of the Air Commerce Act, AS 02.05." The ATC asserts that "if fundamental policy or the particularized expertise or experience of an agency is involved in an agency decision, the courts shall review the decision under the 'reasonable basis' test."

AIRPAC argues that the "independent judgment test" should be applied instead of the "reasonable basis test" because the issue on appeal involves only the construction of a statute. Because this court has held that the "independent judgment test" is appropriate for statutory interpretation issues and that the "reasonable basis test" is appropriate where the agency action resembles executive action or involves policy considerations, AIRPAC argues that the "independent judgment test" must be applied to the case at bar.

We have had a number of opportunities to decide which of these standards of review is applicable when reviewing administrative rulings. In *Earth Resources Company of Alaska v. State, Department of Revenue*, 665 P.2d 960 (Alaska 1983), we stated that:

> The issue becomes, then, what standard of review must be used by an appellate court reviewing an administrative ruling.... This court has distinguished between the rational basis standard for questions of law involving agency expertise and the substitution of judgment standard for questions of law where no expertise is involved. The rational basis test may be applied in two circumstances. First, it is applied where the agency is making law by creating standards to be used in evaluating the case before it and future cases. [Citations omitted] Second, it is applied when a case requires resolution of policy questions which lie within the agency's area of expertise and are inseparable from the facts underlying the agency's decision. [Citations omitted] The rational basis test requires a reviewing court to consider factors of agency expertise, policy, and efficiency

---

**5.** In its order granting summary judgment, the trial court stated:

(1) THAT AS 02.05.050(d)(5) by its terms applies only to a base of operations;

(2) THAT a supplemental base of operations is a separately and independently defined term in AS 02.05.250, different from and in addition to a base of operations;

(3) THAT the legislature has not prohibited air carrier operations from unauthorized sup-

plemental bases of operations in AS 02.05.-050(d)(5), whether by intention or by oversight;

(4) THAT the finding by the Alaska Transportation Commission that Airpac violated AS 02.05.050(d)(5) by maintaining an unauthorized supplemental base of operations is hereby reversed;

when reviewing discretionary decisions. Thus, it is a more deferential standard than the substitution of judgment standard; the court merely seeks to determine whether the administrative agency's decision is supported by the facts and has a reasonable basis in law. *Kelly v. Zamarello*, 486 P.2d 906, 918 (Alaska 1971).

The substitution of judgment standard is applied where the questions of law presented do not involve agency expertise and, thus, a court need not take the deferential stance embodied in the rational basis test. *Kelly v. Zamarello*, 486 P.2d 906, 916 (Alaska 1971). The standard is appropriate where the knowledge and experience of the agency is of little guidance to the court or where the case concerns "statutory interpretation or other analysis of legal relationships about which courts have specialized knowledge and experience." *Id.* Application of this standard permits a reviewing court to substitute its own judgment for that of the agency's, even if the agency's decision had a reasonable basis in law. *See Rogers Construction Co. v. Hill*, 235 Or. 352, 384 P.2d 219, 221–22 (Or.1963).

*Id.* at 964–65.

In the case at bar, the agency is not creating standards; policy questions, which are within the ATC's area of expertise and which are within the ATC's area of expertise and which are inseparable from facts underlying the agency's decision, are not raised. This case turns on pure questions of statutory construction. It is the courts which have the specialized knowledge and experience in statutory construction and we need not defer to an agency's construction of a statute.[6]

**6.** Of course, we recognize that when the court interprets an *ambiguous* statute, "we may ... give *some* weight to the administrative decision even when exercising our independent review." (Emphasis added). *Union Oil Company of California v. Department of Revenue*, 560 P.2d 21, 25 (Alaska 1977) and *Municipality of Anchorage v. Sisters of Providence*, 628 P.2d 22, 31 (Alaska 1981). Thus, were we to find the statute to be

## III. *Did the Legislature Intend that Supplemental Bases Be Certified?*

 The ATC argues that one of the basic rules of statutory construction is that "[s]tatutes are not to be interpreted to render terms within a statute meaningless." The ATC notes that the term supplemental base of operations is only mentioned once in the entire Act, and that one time is in the definition section of the Act, AS 02.05.250. The ATC further notes that base of operations is used not only in the definition section of the Act, but also in numerous sections throughout the Act which specifically dictate how bases of operations are regulated: AS 02.05.-050(d)(4)(A), AS 02.05.050(d)(4)(C) and AS 02.05.050(d)(5).

The ATC contends that the wording of the statute indicates the legislature's intent to include supplemental bases in the term base of operations; otherwise, ATC argues, the definition of supplemental bases becomes meaningless because it is then not tied to the remainder of the statute. The ATC submits that the reason the definition for supplemental base of operations was added to the definition section along with the definition of base of operations was to augment and strengthen the definition of base of operations, in order to regulate and to permit enforcement actions against a carrier oeprating from a point other than its base of operations.

AIRPAC argues (1) that the legislative purpose of including a definition of supplemental base of operations was not to augment the definition of base of operations but to distinguish base of operations from supplemental base of operations," and (2) that by viewing the definition in this light, the definition of supplemental base of operations is not meaningless because it states what need not be certified.[7]

ambiguous, we might examine previous rulings on this issue by the ATC. However, we do not find the statute to be ambiguous.

**7.** First, AIRPAC notes that AS 02.05.050 states that air taxi operators must register their bases of operations and that AS 02.05.050 does not mention that air taxi operators must register supplemental bases. Secondly, AIRPAC notes

■ We find ATC's argument persuasive. "There is a presumption that every word, sentence, or provision was intended for some useful purpose, has some force and effect, and that some effect is to be given to each, and also that no superfluous words or provisions were used." 82 CJS Statutes § 316, p. 551–552 (1953). *See also City of Homer v. Gangl,* 650 P.2d 396, 399 (Alaska 1982) and *City and Borough of Juneau v. Thibodeau,* 595 P.2d 626, 634 (Alaska 1979). If the legislature only intended to regulate bases of operations, there was no need even to define supplemental bases of operations; only a definition of bases of operations would be required. Thus, AIRPAC's analysis makes the definition of supplemental base of operations meaningless and superfluous. Thus, to give meaning to the definition of supplemental bases, we hold that supplemental base of operations is a sub-specie of base of operations and that AS 02.05.050(d)(5), which provides that an air taxi operator may not operate from *more than one base of operations without approval,* requires approval also of supplemental bases of operations.

## IV. *Construction of Supplemental Base of Operations*

The ATC advances the proposition that supplemental base of operations includes any location other than the base of operations where an air taxi operator represents that it engages in air commerce, including the location it has flown to after leaving its base of operations. We find this interpretation of supplemental base of operations to be a violation of AIRPAC's right to free speech.

■ Statutes should be construed, wherever possible, so as to conform to the constitutions of the United States and Alaska. *McCracken v. State,* 518 P.2d 85, 88 (Alaska 1974). The First Amendment, as applied to the states through the Fourteenth Amendment, protects commercial speech, which is communication proposing a commercial transaction. *Central Hudson v. Public Service,* 447 U.S. 557, 561–2, 100 S.Ct. 2343, 2348–49, 65 L.Ed.2d 341, 65 L.Ed.2d 341, 347 (1980). However, the U.S. Supreme Court has held that the U.S. Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Id.* at 563, 100 S.Ct. at 2350. Commercial speech is protected by the First Amendment, if the test of *Central Hudson* is met. In *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), the court summarized the test. It stated that:

> In Central Hudson we adopted a four-part analysis for assessing the validity of restrictions on commercial speech. First, we determine whether the expression is constitutionally protected. For commercial speech to receive such protection, "it at least must concern lawful activity and not be misleading." *Id.,* at 566, 101 S.Ct. 2343, 65 L.Ed.2d 341. Second, we ask whether the governmental interest is substantial. If so, we must then determine whether the regulation directly advances the government interest asserted, and whether it is not more extensive than necessary to serve that interest. Ibid.

*Bolger,* —— U.S. ——, 103 S.Ct. at 2881, 77 L.Ed.2d at 478.

■ In the instant case, there is no allegation of false or misleading advertisement. Nor is the communication related to an illegal activity (such as illegal drug use). *(See Village of Hoffman Estates v. Flip-*

that bases of operations and supplemental bases of operations are created differently. AS 02.05.-250(7) provides that to be a base of operations four requirements must be met; the base must be the place (1) from which the carrier represents to the public that it engages in air commerce, (2) where it stations its aircraft, (3) where it has its facilities, and (4) where it generally conducts its business as an air carrier. To

create a supplemental base of operations, it need *only* be shown that it is the point from which the carrier represents that it engages in air commerce. Lastly, because supplemental bases are defined as *"in addition to"* bases of operations (AS 02.05.250(10)), AIRPAC further argues that the legislature intended to make clear that supplemental bases of operations are distinct and separate from bases of operations.

*side, Hoffman Estates, Inc.,* 455 U.S. 489, 496, 102 S.Ct. 1186, 1192, 71 L.Ed.2d 362, 370 (1982). AIRPAC, Inc. holds a valid operating certificate under AS 02.05.040 and is authorized to engage in air commerce between its base of operations and any location within the state. AS 02.05.-050(d)(6).

However, we find that the *Central Hudson* test has not been met in regard to ATC's argument that the government has a substantial interest in limiting AIRPAC's right to solicit customers for its back-haul trip from Anchorage to Dutch Harbor. Part of the policy and purpose of the Air Commerce Act is to promote safe, adequate, economical and efficient service by air carriers and to provide for fair and equitable competition. AS 02.05.010.[8] It is clear that a certified air taxi operator can represent that it flies from the base of operations to location 'X'. AS 02.05.-050(d)(5) and AS 02.05.250(7). It is also clear that upon request, the air taxi operator may take passengers and/or cargo back to its base of operations and in fact must do so if the request is reasonable and if it is able. AS 02.05.150(1). Air safety is in no way compromised by permitting a certified air taxi operator to represent that it returns to its base of operations as it is already licensed to take passengers and/or cargo back to its base of operations.

Furthermore, restricting an air taxi operator's right to solicit business for the flight back to its base of operations inhibits economical and efficient service. The incentive for an air taxi operator to establish and maintain air service from its base of operations is reduced if it cannot advertise that it provides service back to its base of operations; such a restriction also results in higher fares to compensate for these potential but lost revenues.

We therefore hold that the Air Commerce Act implies that an air taxi operator, which leaves its base of operations and flies to location 'X', can represent that it returns back to its base of operations and that a supplemental base has not been created if it makes such a representation.[9]

█ Thus we conclude that AIRPAC has not created an unauthorized supplemental base in Anchorage because its aircraft was merely returning back to its base of operations in Dutch Harbor. We, therefore, affirm the trial court's order granting summary judgment for the reasons set forth in this opinion.

AFFIRMED.

RABINOWITZ, Justice, concurring in part, dissenting in part.

I concur in the court's rulings contained in parts II and III but have concluded that I must dissent from the court's holding in part IV of its opinion. I agree that the ATC has authority to regulate "supplemental bases", but disagree with the court's unduly restrictive definition of that term. The majority treats the question of whether AIRPAC had established a supplemental base in Anchorage as if an ordinary Dutch Harbor air taxi service, realizing that many of its customers were chartering flights to Anchorage, had simply decided to inform people in Anchorage that those sporadic irregular charters were returning to Dutch Harbor. If this were what AIRPAC had done, I might agree that it had not established a supplemental base. The record, however, reveals that Melody Robinson, an AIRPAC employee stationed in Anchorage, told Anchorage customers that AIRPAC

---

**8.** AS 02.05.010 provides in pertinent part:

 (a) The purpose and policy of AS 02.05.010–02.06.260 is to

 . . . . .

 (3) promote adequate, economical and efficient service by air carriers, and reasonable charges therefor, without unjust discrimination, undue preferences or advantages, and unfair or destructive competitive practices;

 (4) provide for fair and equitable competition through qualified operators who are fit, willing, and able to serve the public with safe, efficient, and continuous air service;

**9.** We do not find it necessary to decide whether AIRPAC made a representation that it engaged in air commerce since a supplemental base could not have been created if it was only returning to its base of operations.

operated a regular 9:00 a.m. flight from Anchorage to Dutch Harbor, and shows that this service was indeed regular. I think the State has a substantial interest in preventing an air taxi operator from making regular and predictable flights from any location without ATC approval. Here, AIRPAC essentially converted its operations into scheduled service. Because today's opinion implies that the State has only an insubstantial interest in regulating this kind of activity, I dissent.