Darlene RYDWELL, Appellant,

v.

ANCHORAGE SCHOOL DISTRICT and
Scott Wetzel Services, Appellees.

No. S–5198.

Supreme Court of Alaska.

Dec. 3, 1993.

Joseph A. Kalamarides, Kalamarides &
Associates, Anchorage, for appellant.

Penny L. Zobel and Deirdre D. Ford,
Staley DeLisio & Cook, Anchorage, for ap-
pellees.

Before MOORE, C.J., and
RABINOWITZ, BURKE, MATTHEWS and
COMPTON, JJ.

*OPINION*

MOORE, Chief Justice.

## I. INTRODUCTION

In this workers' compensation appeal, we
must decide whether AS 23.30.190(b), which
requires use of the American Medical Asso-
ciation's *Guides to the Evaluation of Per-
manent Impairment* for determinations of
permanent partial impairment compensa-
tion, also governs determinations of perma-
nent impairment under AS 23.30.041(f)(3), a
provision making an employee with no per-
manent impairment ineligible for vocational
rehabilitation benefits. We hold that it
does.

## II. FACTS AND PROCEEDINGS

In March 1990 Darlene Rydwell, a build-
ing plant operator for the Anchorage
School District (District), felt chest pains

while shovelling snow at Oceanview Elementary School. Her treating physician, Dr. Stanley N. Smith, initially diagnosed her condition as left costochondritis with bicipital tendinitis,[1] and subsequently concluded that Rydwell had developed fibromyositis in the shoulder girdle, a result of overuse.[2] Dr. Smith took her off work and prescribed physical therapy for her. In May Rydwell requested an eligibility evaluation for vocational rehabilitation.

Because he did not think that she was medically stable yet, Dr. Smith did not immediately assign Rydwell a permanent impairment rating, and instead had her undergo a work capacities evaluation with Work Therapy Enterprises (WTE). The WTE therapist, Kathryn Less, found her physical capacities to be "severely below normal for a female of her size and age," and recommended a four to six week work hardening program. Rydwell participated in the program from mid-July through early August, but her condition did not improve much, and Less recommended that she resume the program in September.

On August 13, Rydwell and Less consulted with Dr. Smith. Dr. Smith agreed that continued work hardening therapy would be beneficial, but he doubted that Rydwell would be able to return to her old job and suggested "cross training into a field that is physically less demanding." The next day Rydwell saw Dr. Edward M. Voke, an orthopedic specialist, who diagnosed her condition as "minimal degenerative disc disease" and a strain in the left rhomboid muscle. He too recommended continued work hardening, with preparation for work less stressful than that which Rydwell had done before. He did not give a rating of permanent impairment for Rydwell.

Rydwell resumed her work hardening program in September. During this time, Dr. Smith observed that Rydwell's problems did not translate to a permanent impairment as defined in the American Medical Association's *Guides to the Evaluation of Permanent Impairment* (3d rev. ed. 1990) [hereinafter *AMA Guides*]:

Unfortunately [the *AMA Guides*] define impairment ratings in very concrete terms of ankylosis and loss of function, whether it be nerve function or muscular function and [Rydwell] does not demonstrate this. Yes, we can demonstrate on this exam, a loss of 10% of supination in the left forearm, 10° of extension in the upper extremity at the shoulder girdle, a loss of 10° of abduction in the shoulder girdle and loss of 10° internal in the left upper extremity. These translate into 0 disability based on function alone.

. . . .

Strictly following the impairment ratings, mentioned above, I could not give her a rating of disability more than 5–10% just based on pain alone with no other deficits being noted.

After Rydwell completed the September work hardening sessions, Dr. Smith gave her a permanent impairment rating of zero under the *AMA Guides*, and set August 13 as the date on which she reached medical stability. Neither the WTE therapists nor Dr. Smith believed that Rydwell was able to return to her original job.

In December the Reemployment Benefits Administrator (RBA) assigned Dennis Johnson, a rehabilitation specialist, to perform Rydwell's eligibility evaluation for reemployment benefits. At that time, Dr. Smith concluded that Rydwell's physical capacities were less than the physical demands of her position, and that Rydwell would be unable to return to her original job. Though Johnson agreed, he nonetheless found Rydwell ineligible for reemployment benefits, because Dr. Smith had given her a zero permanent impairment rating. The RBA accepted Johnson's conclusions and denied Rydwell reemployment benefits in February 1991.

The Alaska Workers' Compensation Board (Board) overturned the RBA's deci-

---

**1.** Costochondritis is an inflammation of the junction between the ribs and the cartilage on the chest wall. Bicipital tendinitis is an inflammation of the tendons in the bicep muscle.

**2.** Fibromyositis is a chronic muscle inflammation with an overgrowth of the connective tissue. *Stedman's Medical Dictionary* 583 (25th ed. 1990).

sion in May 1991. Analyzing recent changes in the Workers' Compensation Act, *see* ch. 79, §§ 10, 34, SLA 1988, the Board construed legislative intent to allow vocational rehabilitation in cases like that of Rydwell:

> [O]ne purpose of the amendment to [AS 23.30.041] was to create a less expensive system with fewer participants in it. An additional purpose was to provide vocational rehabilitation services to employees who are not employable without them. Though there is a potential tension between these two purposes, it is unimaginable to us that the Legislature intended that an employee·who cannot return to employment because of a work injury without reemployment benefits would be denied them.

(Footnotes omitted). Breaking with its own precedent, the Board held that AS 23.30.190(b), which mandates the use of the *AMA Guides* for evaluations of permanent impairment, did not apply to AS 23.30.041. The Board concluded that if an employee has an objectively measurable permanent impairment, but that impairment would receive a zero rating under the *AMA Guides*, the employee is nonetheless eligible for vocational rehabilitation.

The superior court reversed the Board decision in May 1992. Judge Joan Katz held that the Board's reading of permanent impairment, as that term applied to AS 23.30.041, was contrary to legislative intent and inconsistent with usage of the term in AS 23.30.190. Rydwell appeals.

## III. DISCUSSION

■ Both parties agree that if the superior court's decision is proper, then Rydwell is not entitled to benefits. Therefore, resolution of this question turns upon statutory interpretation, and this court reviews the Board's reading of AS 23.30 under the independent judgment standard, making its own interpretation of the statutes involved. *See, e.g., Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987); *Phillips v. Houston Contracting, Inc.*, 732 P.2d 544, 546 (Alaska 1987); *Hood v. State, Workmen's Compensation Bd.*, 574 P.2d 811, 813 (Alaska 1978).[3] Because the superior court acted as an intermediate court of appeal, this court gives no deference to its decision. *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992).

■ When construing a statute, this court endeavors to give effect to legislative intent, with due consideration for the meaning that the language of the statute conveys to others. *Forest v. Safeway Stores, Inc.*, 830 P.2d 778, 781 (Alaska 1992). Whenever possible, this court interprets each part or section of a statute with every other part or section, so as to create a harmonious whole. *Id.* Under the 1988 amendments to the Workers' Compensation Act, we do not construe ambiguities in the workers' compensation laws in favor of either party. *See* ch. 79, § 1(b), SLA 1988.

Two provisions of AS 23.30.041 govern the type of injury necessary for an employee to be eligible for reemployment benefits.

**3.** Rydwell argues, and the dissent agrees, that this court should use the "reasonable basis" standard of review for the Board's analysis of the policy of the statute. Typically, the "reasonable basis" standard of review applies "where the agency is making law by creating standards to be used in evaluating the case before it and future cases," or "when a case requires resolution of policy questions which lie within the agency's area of expertise and are inseparable from the facts underlying the agency's decision." *Earth Resources Co. v. State, Dep't of Revenue*, 665 P.2d 960, 964 (Alaska 1983); *see also Hood*, 574 P.2d at 813.

In this case, the Board based its reading of statutory language upon general principles of statutory construction and an analysis of legisla-

tive intent. The Board did not apply statutory provisions to complex or technical facts within its expertise. Furthermore, the Board's interpretation is not a longstanding one to which this court should give some weight. *Cf. State, Dep't of Revenue v. Debenham Elec. Supply Co.*, 612 P.2d 1001, 1003 n. 6 (Alaska 1980). Because "the agency's specialized knowledge and experience would not be particularly probative as to the meaning of the statute," *Kenai Pipe Line*, 746 P.2d at 903, and because this case "implicates analysis of legal relationships to which courts are particularly well-suited," *Union Oil Co. v. State*, 804 P.2d 62, 64 (Alaska 1990), the "independent judgment" standard of review is appropriate here. *See, e.g., Hood*, 574 P.2d at 813.

First, an employee is eligible only if "a physician predict[s] that the employee will have permanent physical capacities that are less than the physical demands of the employee's job as described in the United States Department of Labor's 'Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles.'" AS 23.30.041(e). Second, an employee is not eligible for benefits if "at the time of medical stability no permanent impairment is identified or expected." AS 23.30.-041(f)(3). This second requirement is at issue here, where a measurable physical impairment exists but translates into a zero permanent impairment rating under the *AMA Guides.*

Alaska Statute 23.30.041 provides no definition of "permanent impairment." No explanation of the term appears at AS 23.30.-265, the list of definitions applicable to all of the Workers' Compensation Act. Instead, the use of the *AMA Guides* to determine permanent impairment is prescribed at AS 23.30.190, the statute governing permanent partial impairment (PPI) compensation:

> All determinations of the existence and degree of permanent impairment shall be made strictly and solely under the whole person determination as set out in the American Medical Association Guides to the Evaluation of Permanent Impairment, except that an impairment rating may not be rounded to the next five percent.

AS 23.30.190(b). No statutory language expressly requires the application of AS 23.30.190(b) to the rest of the Act.[4] Furthermore, though the 1988 amendments to the Act made sweeping changes to AS 23.-30.041 and .190, *see* ch. 79, §§ 10, 34, SLA 1988, neither party shows that the legislature expressly contemplated or excluded the application of AS 23.30.190(b) to vocational rehabilitation claims.

We are, nonetheless, persuaded that the term "permanent impairment" means the same thing in AS 23.30.041 as it does in AS 23.30.190. The term was newly introduced to the workers' compensation statutes by the 1988 legislature in enacting Chapter 79, SLA 1988. Section 34 of Chapter 79 became AS 23.30.190 and Section 10 became AS 23.30.041. Those are the only sections which employ the term "permanent impairment" in the workers' compensation statutes. It is most logical that the legislature intended the term to mean the same thing in both sections in which the term is used. Indeed, if "permanent impairment" as used in Section 10 of Chapter 79 of the 1988 session laws was not intended to mean the same thing as "permanent impairment" in Section 34 where the term is defined, one would expect to find a separate definition in Section 10.

In support of this interpretation we find persuasive the District's argument analyzing the interaction of the vocational rehabilitation provisions with the provisions for disability compensation. The legislature intended that employees have an income source during the time that vocational rehabilitation keeps them out of the job market. *See* Sectional Analysis of Workers' Compensation Task Force SB 322 and HB 352, at 4 (1988) Part of this supplemental income is in the form of PPI compensation:

> If an employee reaches medical stability before completion of the plan, temporary total disability benefits shall cease and permanent impairment benefits shall then be paid at the employee's temporary total disability rate. If the employee's permanent impairment benefits are exhausted before the completion or termi-

---

**4.** In *Polk County Bd. of County Comm'rs v. Patterson,* 433 So.2d 1298 (Fla.App.1983), the court held that even though a permanent impairment rating under the *AMA Guides* was required for an award of permanent impairment benefits, such a rating was not necessary for receiving vocational rehabilitation benefits, because nothing in the relevant Florida statute "makes such a rating a condition precedent to an award of rehabilitation benefits." *Id.* at 1298; *see also*

Jane M. Draper, Annotation, *Workers' Compensation: Vocational Rehabilitation Statutes,* 67 A.L.R.4th 612, 632–33 (1989) (citing this case alone for the proposition that an AMA permanent injury rating is not a prerequisite for receiving reemployment benefits). *Patterson* is not helpful here, because the Florida statute at issue does not use the term "permanent impairment." *See* Fla.Stat.Ann. § 440.49(1)(a) (West 1991).

nation of the reemployment plan, the employer shall provide wages equal to 60 percent of the employee's spendable weekly wages but not to exceed $525, until the *completion or termination of the plan.*

AS 23.30.041(k). Accordingly, AS 23.30.190 recognizes that PPI benefits are payable as part of vocational rehabilitation, and distinguishes the payment scheme in AS 23.30.041 from the lump-sum payment allowed otherwise. *See* AS 23.30.190(a).

■ The District argues that the close tie between vocational rehabilitation and PPI compensation indicates that eligibility for PPI benefits is a prerequisite for obtaining reemployment benefits. If Rydwell, who presumably is ineligible for PPI benefits under AS 23.30.190, may nonetheless receive reemployment benefits, then she will have no income during the period of her vocational rehabilitation, because she has reached medical stability and therefore can no longer receive benefits for temporary total disability. *See* AS 23.30.041(k). Reading AS 23.30.190(b) to control the evaluation of permanent impairment under AS 23.30.041(f)(3) carries out the legislature's intent that employees must have a supplemental income source during the rehabilitation process.

Such a reading also meshes well with the literal language of AS 23.30.041(k), which provides a fall-back source of income if the employee's PPI benefits "are exhausted before the *completion or termination of the* reemployment plan." This language clearly presumes that the employee has been eligible for PPI compensation, and it does not contemplate a situation in which there are no PPI benefits to exhaust. This argument indicates that the legislature did not intend that one who does not qualify for PPI benefits would be eligible for vocational rehabilitation.

To support its contention that AS 23.30.190(b) controls determinations under AS 23.30.041, the District also looks to broader legislative motives for the 1988 revisions:

It is the intent of the legislature that AS 23.30 be interpreted so as to ensure the quick, efficient, fair, and predictable delivery of indemnity and medical benefits to injured workers *at a reasonable cost to the employers* who are subject to the provisions of AS 23.30.

Ch. 79, § 1(a), SLA 1988 (emphasis added). The District views the provisions requiring objective bases for claims, *see* AS 23.30.041(e), (p)(4), .190(b), as one means by which the legislature sought to reduce baseless claims and thus lower costs. We agree that the legislature's concerns with objective diagnoses and reducing costs to employers are instructive in this case. These concerns provide a logical explanation for a statutory scheme which sets rather stringent bright-line measures.

In this case, no impairment was found under the AMA ratings, yet the employee's doctors concluded that she could not meet the physical demands of her job. To find for the employee would create a gray area of "permanent impairment" for purposes of AS 23.30.041(f)(3), which could be satisfied by an impairment registering zero on the *AMA Guides* scale. Such a holding would greatly reduce the predictability, objectivity, and cost-reduction which the legislature imbedded within AS 23.30.190 by incorporating the *AMA Guides* test for impairment, and thus seems counter to legislative intent.

■ Finally, reading AS 23.30.190(b) to control permanent impairment evaluations under AS 23.30.041(f)(3) gives full meaning to the latter provision. If, as the Board held, the permanent impairment requirement were satisfiable through a mere showing of "some objectively measurable physical or mental impairment," made without reference to the *AMA Guides*, then the permanent impairment analysis under AS 23.30.041(f)(3) would be essentially identical to the physical capacities analysis under AS 23.30.041(e). The only difference between the two analyses would be that one is conducted before an employee reached medical stability and the other is conducted after medical stability occurred. We recognize a presumption that the legislature intended every word, sentence, or provision of a statute to have some pur-

pose, force, and effect, and that no words or provisions are superfluous. *Alaska Transp. Comm'n v. AIRPAC, Inc.*, 685 P.2d 1248, 1253 (Alaska 1984). Incorporating AS 23.30.190(b) into AS 23.30.041(f)(3) satisfies this basic principle of statutory interpretation by preventing redundancy.

The dissent argues that our decision that Rydwell is ineligible for reemployment benefits despite her inability to return to her pre-injury job is "anomalous." Dissent at 532. This argument fails to consider that an employee in Rydwell's situation is not necessarily ineligible for a permanent total disability rating under AS 23.30.180. Disability ratings, as distinct from ratings based on the recently introduced concept of permanent impairment, are based on the worker's loss of earning capacity and are not measured by any particular degree of medical impairment. *See, e.g., Olson v. AIC/Martin J.V.*, 818 P.2d 669, 673 (Alaska 1991); *Vetter v. Alaska Workmen's Compensation Board*, 524 P.2d 264, 266 (Alaska 1974). The dissent overlooks this critical distinction in citing the introductory materials to the *AMA Guides.* Dissent at 532. The quoted material cautions against a " 'one-to-one' translation of impairment to disability." Dissent at 532. Alaska's statutory scheme does not use the *AMA Guides* to determine *disability*, which requires a discretionary analysis considering incapacity in relation to employment potential. Alaska Statute 23.30.190 does, however, utilize the *AMA Guides* to provide a predictable standard for *impairment*, which measures the employee's absolute physical capacity. The impairment deter-

mination need not be made unless the Board fails to find a permanent total disability.[5] *See* AS 23.30.190(a) (permanent impairment determination made "[i]n case of impairment partial in character but permanent in quality, and *not resulting in permanent total disability.*") (emphasis added).

To summarize, under the most appropriate reading of AS 23.30.041, an employee must satisfy two tests in order to be eligible for reemployment benefits. First, before the employee has reached medical stability, a physician must predict that the employee's physical capacities will not be sufficient for the physical demands of her original job. AS 23.30.041(e). This test allows an employee to start vocational rehabilitation before she reaches medical stability, and serves the legislature's goal of encouraging early rehabilitation intervention. Second, once the employee has reached medical stability, she must have a permanent impairment, calculated pursuant to AS 23.30.190(b)'s provisions for use of the *AMA Guides.* *See* AS 23.30.041(f)(3).[6]

## IV. CONCLUSION

Because AS 23.30.190(b)'s rule for evaluating permanent impairments should control the determination of a permanent impairment under AS 23.30.041(f)(3), and because Rydwell received a rating of zero permanent impairment under the *AMA Guides,* the superior court correctly found her ineligible for reemployment benefits.

AFFIRMED.

COMPTON, J., dissents.

---

5. The dissent also argues that our interpretation leads to an overemphasis on the timing of "medical stability." Dissent at 3–4. While our interpretation does elevate the importance of medical stability, this result is not inconsistent with the statutory scheme. As discussed *supra,* AS 23.30.041(k) contemplates PPI benefits being paid if eligibility for temporary total disability benefits ceases during the course of the reemployment plan. AS 23.30.185 provides that "[t]emporary total disability benefits may not be paid for any period of disability occurring after the date of medical stability." Thus, at the time of medical stability, an employee receiving reemployment training must (1) qualify for permanent total disability benefits under AS 23.30.180 and therefore cease reemployment training

because it will be fruitless; (2) qualify for PPI benefits under AS 23.30.190 and continue reemployment training; or (3) cease reemployment training because the employee's physical incapacity does not rise to the minimum level of permanent impairment which would warrant benefits under the objective criteria of AS 23.30.190. This result follows logically from the appropriate statutes.

6. The District also contends that the Board's decision was not based on substantial evidence. Because we hold that AS 23.30.190(b) controls permanent impairment determinations under AS 23.30.041(f)(3), we need not reach this argument.

**532**

COMPTON, Justice, dissenting.

In this case the court reaches an anomalous result. It acknowledges that Darlene Rydwell is physically unable to return to her pre-injury job; nonetheless, it denies her rehabilitation benefits.

The court argues that this result is not anomalous because Rydwell may be eligible for PTD benefits. At 531. The court notes that an impairment determination is made when the Board "fails to find a permanent total disability." At 531; *see* AS 23.30.190(a). Thus, when a doctor consults the American Medical Association *Guides to the Evaluation of Permanent Impairment* (*AMA Guides*)—at the determination of impairment—the possibility of PTD benefits has already been foreclosed; in addressing the issue of "impairment" the Board has necessarily answered the permanent disability question in the negative. Because Rydwell was evaluated for impairment, the court concedes that Rydwell is *not* eligible for PTD benefits. Thus, under the court's triple option, At 531 n. 5, Rydwell falls under category "(3)." Although she is incapacitated to the extent that she cannot return to her previous job, her incapacity "does not warrant" rehabilitation. Regardless of the court's word games, this is an anomalous and undesirable result.

This case involves considerations of public policy, and interpretation and application of the *AMA Guides,* all of which implicate Board expertise. *Earth Resources Co. v. State, Dep't of Revenue,* 665 P.2d 960, 964 (Alaska 1983); *Kelly v. Zamarello,* 486 P.2d 906, 916–17 (Alaska 1971). Accordingly, I would defer to the Board's judgment, which in this case has a reasonable basis.

Alaska Statute 23.30.190 provides in part: "All determinations of the existence and degree of permanent impairment shall be made strictly and solely ... [under the *AMA Guides*]." AS 23.30.190(b). The only exception is that impairment ratings may not be rounded to the nearest five percent. *Id.* The legislature thus intended that "permanent impairment" be determined by reference to specific materials that include tables and formulae as well as directions how to apply such data. Section 1.3 of the *AMA Guides,* entitled "Medical Impairment and Workers' Compensation," provides in part:

> While medical information is necessary for the decision process, a critical problem arises in the use of that information. Neither in this example nor in general is there a formula under which knowledge of the medical condition may be combined with knowledge of the other factors to calculate the percentage by which the industrial use of the employee's body is impaired. Accordingly, *each commissioner or hearing official must come to a conclusion based on his or her assessment of the available medical and nonmedical information.*
>
> It is evident that the *Guides* does not offer a solution for this problem, nor is it the intention that it do so. Each administrative or legal system that uses permanent impairment as a basis for disability rating needs to define its own process for translating knowledge of a medical condition into an estimate of the degree to which the individual's capacity to meet personal, social, or occupational demands, or to meet statutory or regulatory requirements, is limited by the impairment. *We encourage each system not to make a "one-to-one" translation of impairment to disability, in essence creating a use of the Guides which is not intended.*

*AMA Guides* § 1.3, at 6 (emphasis added). The *AMA Guides* recognizes the limitations of its rating system; any empirical classification of "permanent impairment," a condition resulting from multiple variables, will necessarily be imperfect. Accordingly, the *AMA Guides* contemplates that final decisions regarding impairment be left to a commissioner or hearing official. In this case the Board can best assess the information relevant to the impairment determination.

Both parties concede that even though Rydwell is not "physically impaired" under the *AMA Guides,* she is impaired in a broader sense; she is unable to return to her previous job. At 527. Certainly the AMA, cautioning against "one-to-one" ap-

plication, contemplated cases in which the application of *AMA Guides* results does not reflect reality. The narrow construction of "physical impairment" applied by this court is thus inconsistent with the intended use of the *AMA Guides*.

Furthermore, under the court's reasoning, "medical stability" assumes an unintended legal significance. Alaska Statute 23.30.041(k) contemplates that an injured worker can enter rehabilitation prior to "medical stability." It attempts to maintain benefits for workers in rehabilitation who reach medical stability and as a result lose temporary total disability (TTD) benefits. *See* AS 23.30.185. It maintains income by distributing PPI benefits at the TTD rate. AS 23.30.041(k). From this the court concludes that "eligibility for PPI benefits is a prerequisite for obtaining reemployment benefits." At 530. However, AS 23.30.041(f)(3) provides: "An employee is not eligible for remployment [sic] benefits if ... *at the time of medical stability* no permanent impairment is identified or expected." *Id.* (emphasis added). Thus, eligibility for PPI benefits only becomes a prerequisite for rehabilitation benefits only *after* medical stability.

The argument that "medical stability" is the point at which physical impairment should be measured is not supported by law or fact: (1) medical stability is legally linked to the determination of *disability*[1]; (2) AS 23.30.190, which defines "permanent impairment," is not linked to medical stability; and (3) in this case Dr. Smith made a *retrospective* stability determination.[2] It does not appear that the legislature contemplated that rehabilitation benefits be contingent on the date of medical stability.

If the statute does link the physical impairment determination to medical stability, the following question immediately arises: what happens to workers who are undergoing rehabilitation at the time they reach medical stability if they then receive a zero permanent impairment rating? This court's conclusion would require the Board to terminate their rehabilitation. I cannot see how the legislature intended this result.[3] Indeed, this result undermines the intention of predictability that the court ascribes to the legislature. At 531. Employers seeking to avoid paying for rehabilitation may attempt to accelerate the medical stability determination, while workers who cannot return to their pre-injury jobs may attempt to delay.

The Board has the expertise to interpret and apply the necessarily discretionary *AMA Guides* so as to clarify the relationship between the permanent impairment rating and the date of medical stability, as well as to resolve situations not foreseen by the legislature. Accordingly, we should defer to its judgment.

For all of the foregoing reasons, I dissent.

1. The court correctly notes the difference between the disability and impairment determinations. At 531.

2. Dr. Smith rated Rydwell zero in September 1990 and at that time set medical stability at August 13, 1990.

3. Further issues arise as to whether such workers would have to reimburse the employer for the cost of rehabilitation, and why employers would expend resources to rehabilitate workers, only to have such rehabilitation subject to termination.