Alfred W. HOLDING, Appellant,

v.

MUNICIPALITY OF ANCHORAGE,
Appellee.

No. S–10401.

Supreme Court of Alaska.

Jan. 31, 2003.

Lawrence A. Pederson, Paul J. Nangle &
Associates, Anchorage, for Appellant.

Linda J. Johnson, Deputy Municipal Attorney, and William A. Greene, Municipal Attorney, Anchorage, for Appellee.

Before FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and
CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

The Municipality of Anchorage licenses the operation of "adult-oriented establishments." By ordinance it forbids persons from advertising adult-oriented establishments unless they are licensed to operate or maintain the business. The municipality issued Alfred Holding five citations for violating this ordinance by advertising for adult-oriented establishments he was not licensed to operate or maintain. Holding challenged the ordinance on its face and as applied to him. A hearing officer found against him and the superior court affirmed. We affirm, because Holding had no vested property right to advertise that somehow would have given him "grandfather rights" to advertise the establishments notwithstanding the prohibition. We also reject his claim that the ordinance unconstitutionally interfered with his rights of commercial free speech, because we conclude that the restriction directly advances a substantial government interest and is no more restrictive than necessary to advance that interest.

## II. FACTS AND PROCEEDINGS

Alfred Holding owns real properties within the Municipality of Anchorage on which five adult-oriented businesses are operated: Fantasy's Escort Service, Toyko Club, Alaskan Trapline, Playmates, and Oasis. Holding is not licensed to operate adult-oriented businesses. He leases the properties to third persons who obtain the proper licenses and operate the businesses. He visits the businesses at least once a day to ensure that there are no drugs or alcohol, and removes persons running the businesses from the premises if they break the law. He has only an oral lease with each of the business operators. Holding places and pays for the businesses' telephone lines and advertising.

The Municipality of Anchorage issued Holding five citations for violating a code subsection forbidding persons from advertising adult-oriented businesses unless they are licensed to operate those businesses.[1] He was fined $75 for each violation. Holding admitted to the officers who issued the citations and in his request for a hearing that he had paid for the businesses' advertising. He claimed that enforcement of the code subsection violated his "grandfather rights" to advertise the businesses and unconstitutionally impaired his rights of free speech.

A municipal hearing officer ruled that even though Holding had been providing telephone service and advertising to the leased businesses before the code section was adopted, Holding had "failed to provide any evidence" that he had grandfather rights that would preclude applying the license requirement. The hearing officer, relying on *Central Hudson Gas & Electric v. Public Service Commission*,[2] also held that Holding's First Amendment commercial free speech rights were not violated because "there is no prohibition of advertising, only a requirement that a license be obtained before the advertisement is purchased." The hearing officer therefore ordered Holding to pay the $375 fine for the five violations of AMC 10.40.050.

Holding appealed to the superior court, which affirmed. It held that the code provision Holding cited in support of his claim of grandfather rights—AMC 21.55.030—applied only to nonconforming land uses and did not entitle Holding to the relief he sought. The superior court found that Holding owned the five businesses, and that Holding did not present evidence sufficient to prove that the licensing code subsection AMC 10.40.050, which "promote[s] the public health and welfare," abridged Holding's livelihood. It held that, at most, the code subsection challenged by Holding requires him to obtain a license.

---

**1.** *See* Anchorage Municipal Code (AMC) 10.40.050 (1994). AMC 10.40.050(B)(1) states: "Except as provided in subsection B.4 of this section, from and after May 1, 1994, no adult-oriented establishment shall be operated or maintained in the municipality without first obtaining a license to operate issued by the municipal clerk." AMC 10.40.050(B)(5) states: "No

person shall advertise or offer services regulated by this chapter unless they are licensed to provide such services pursuant to this chapter."

**2.** 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

It held that the code does not take his property or impede his businesses.

Finally, the superior court held that Holding's First Amendment commercial speech rights were not violated because Holding was not prohibited from advertising; he was only prohibited from advertising without a license. It held that Holding did not have an interest in advertising for a business he claimed he did not own and that, even if he did have an interest, it would not be enough to overcome the municipality's interest in keeping track of who owns and runs adult-oriented businesses by requiring licenses.

Holding appeals.

## III. DISCUSSION

### A. Standard of Review

We review questions of law, including matters of statutory interpretation, by employing our independent judgment where the questions of law do not involve agency expertise.[3] When the question does implicate agency expertise, we apply the reasonable basis standard in which " 'a reviewing court ... consider[s] factors of agency expertise, policy, and efficiency.' "[4] We independently review questions of constitutional law.[5] We review an administrative agency's findings of fact for clear error, "reversing them only if they are not supported by substantial evidence on the whole record."[6]

### B. Holding's Claim of a Grandfather Right To Advertise

Holding argues that enforcing AMC 10.40.050(B)(5) against him reduces the value of businesses that existed before passage of the code subsection. He asserts that he has a vested right in the advertising he provides to the five businesses operating on his properties, and that his practice of advertising is protected against enforcement because it is a "nonconforming use." He argues that the value of his property interest would be diminished if he is unable to provide his tenants with the valuable business attributes of continuity in established business names, telephone numbers, and advertising. The code subsection's restriction on his ability to offer continuous advertising—which he asserts is available only if he contracts and pays for it—thus allegedly violates Holding's grandfather rights.

We perceive no right to pursue a preexisting "nonconforming use" in this case. The municipality's code provision expressly addressing the issue protects only nonconforming uses of land.[7] It does not apply to off-site advertising of business names and telephone numbers. And, as the municipality argues, AMC 10.40.050 granted no grandfather rights.

The municipality notes the seeming tension between Holding's contentions that he does not own, operate, or control the businesses and his claim of vested property rights in the telephone numbers and in advertising the businesses.

Holding's assertion that he does not own or operate the businesses is fatal to his claim that he has a vested interest in being able to advertise them personally. Holding's valid interest in maximizing the rental value and profitability of his properties does not mean that he has a protectable property right that frees him from any governmental regulation whatsoever.

The cases Holding relies on do not justify reversal. Holding quotes *Bidwell v. Scheele*[8] to support his argument that vested rights are protected against state action by the Fourteenth Amendment of the United States Constitution and article I, section 7 of the

---

3. *Alaska Transp. Comm'n v. AIRPAC, Inc.*, 685 P.2d 1248, 1252 (Alaska 1984).

4. *Id.* at 1251.

5. *Tlingit–Haida Reg'l Elec. Auth. v. State*, 15 P.3d 754, 761 (Alaska 2001).

6. *Id.* (internal quotation marks omitted).

7. AMC 21.55.030 provides in pertinent part:

Where, at the time of the original passage of applicable regulations, lawful use of land existed which would not be permitted by the regulations thereafter imposed by chapters 21.35 through 21.50, and where such use involves no individual structure other than small or minor accessory buildings, the use may be continued so long as it remains otherwise lawful. . . .

8. 355 P.2d 584, 586 (Alaska 1960).

Alaska Constitution. But Holding has no vested rights here. Holding also relies on *Frontier Saloon, Inc. v. Alcoholic Beverage Control Board.*[9] We there recognized that due process protects an interest in a lawful business. The business in that case was a bar whose alcohol distribution was regulated by the Alcoholic Beverage Control Board. We held that due process protected the license to sell alcohol, in part because of the economic loss that would result from suspending the license.[10]

*Bidwell* and *Frontier Saloon* do not stand for the proposition that enforcing AMC 10.40.050(B)(5) against Holding deprives him of a vested interest in advertising businesses that he is not licensed to operate or maintain.

Holding seems to suggest that enforcement of the advertising prohibition by the municipality would result in a compensable governmental taking of his property. In *Balough v. Fairbanks North Star Borough,*[11] we held that the borough's rezoning and subsequent denial of grandfather rights to a landowner who used her property as a junkyard did not constitute an unconstitutional taking. First, we held that there was no per se taking [12] because "[w]hile the . . . decision to deny Balough grandfather rights would terminate her right to use her property as a junkyard, the decision did leave her with economically feasible use[s] of her property."[13] Second, we held that the government's action did not amount to a taking because it was a legitimate response to residents' concerns about safety and aesthetics, because the rezoning did not create the costs Balough incurred, and because the rezoning did not interfere with reasonable investment-backed expectations.[14]

In this case, there was no per se taking because the subsection does not interfere with Holding's ability to lease his properties. The enforcement of the subsection also does not constitute a taking under the three-step analysis. The government's interest in regulating adult-oriented businesses by knowing who owns and operates them is legitimate. The subsection has no legally significant economic impact on Holding because he may continue to lease his property, even though it may be on somewhat less valuable terms. There is no unavoidable economic loss to the businesses: if Holding is not allowed to advertise without a license, he can either obtain a license to operate and then continue to advertise, or the tenant can take on the advertising expenses. Lastly, it does not interfere with reasonable investment-backed expectations.

We conclude that there is no merit to Holding's claim that enforcing the prohibition violated his grandfather rights. Holding's interest in preserving continuity of telephone numbers and advertising accounts did not vest rights in him that rendered the subsection unenforceable as to him.

## C. Holding's Commercial Free Speech Rights

Holding next argues that restricting his ability to advertise interferes with his rights of commercial free speech as protected by article I, section 5 of the Alaska Constitution, and the First Amendment of the United States Constitution. He discusses the Anchorage regulation in the context of the four-prong test described in *Alaska Transportation Commission v. AIRPAC, Inc.*[15] First, he

---

**9.** 524 P.2d 657 (Alaska 1974).

**10.** *Id.* at 659–60.

**11.** 995 P.2d 245 (Alaska 2000).

**12.** The two categories of per se takings are: "(1) cases of physical invasion and (2) cases where a regulation denies a landowner of all economically feasible use of the property." *Id.* at 265.

**13.** *Id.* at 266.

**14.** The three factors that the court considers in deciding if the government's actions resulted in a

taking are: "(1) the character of the governmental action; (2) its economic impact; and (3) its interference with reasonable investment-backed expectations." *Id.* at 265.

**15.** 685 P.2d 1248 (Alaska 1984). In that case we adopted the test first articulated in *Central Hudson v. Public Service Commission,* 447 U.S. 557, 564, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), and reiterated in *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 68, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983):

First, we determine whether the expression is constitutionally protected. For commercial

asserts that the activities—including his lessees' acts in operating adult-oriented businesses and his acts in placing and paying for the advertising—are legal, and that because the advertisements do not say who placed the ads, they are not misleading. Second, Holding concedes the substantiality of the governmental interests in protecting the general welfare, minimizing a decline in property values, minimizing criminal activity, and protecting families. Holding challenges the third prong by arguing that the subsection does not advance the governmental purposes because regulating who places ads "does not serve to protect property values, minimize crime, or protect families." Finally, Holding claims that it is difficult to determine whether the ordinance is more restrictive than necessary to advance the governmental interests because, he argues, it does not further a legitimate governmental interest. He therefore concludes that the subsection is unconstitutional.

The hearing officer ruled that the subsection did not violate Holding's free speech rights because it only required Holding to get a license before he advertises; the subsection did not altogether prohibit him from advertising. The superior court wondered whether Holding meant to assert that his free speech rights entitled him to advertise for any business he does not own. It concluded that the restriction, as part of a larger regulatory scheme, promotes responsibility and discourages misleading information.

In *Barber v. Municipality of Anchorage,*[16] we recognized that commercial speech commands less protection than noncommercial speech. We said that the First Amendment does not impede the state from ensuring that commercial information is not misleading.

We held that a content-neutral restriction on sign-posting was not an unconstitutional restriction on commercial speech because "the questioned ordinance is narrowly tailored to achieve the Municipality's aesthetic goal of eliminating visual blight, and ... alternative means of communication remain available to Barber."[17]

■ The ordinance here does not restrict what the advertisements can say; it only restricts who can place the advertisements. But just because the law does not restrict what can go into the advertisement does not necessarily mean the law is a content-neutral regulation. The Anchorage Municipal Code contains no general requirement that a person must have a license to operate a business before he or she can advertise for that business. Instead, the code only prohibits persons from advertising for adult-oriented entertainment establishments,[18] masseuses,[19] private detectives,[20] and public concerts[21] without having municipal licenses to conduct those activities.

The situation is similar to one addressed by the United States Supreme Court in *Carey v. Brown.*[22] In that case, the Court struck down a state statute that prohibited picketing of residences or dwellings but exempted "the peaceful picketing of a place of employment involved in a labor dispute."[23] Although the law did not in any way regulate what the picketers could say, the Court nonetheless observed that the regulation was a content-based restriction on speech: "It is, of course, no answer to assert that the ... statute does not discriminate on the basis of the speaker's viewpoint, but only on the basis

speech to receive such protection, it at least must concern lawful activity and not be misleading. Second, we ask whether the governmental interest is substantial. If so, we must then determine whether the regulation directly *advances the governmental interest asserted,* and whether it is not more extensive than necessary to serve that interest.

*AIRPAC,* 685 P.2d at 1253 (internal quotation marks and citation omitted).

**16.** 776 P.2d 1035, 1037 (Alaska 1989).

**17.** *Id.* at 1038.

**18.** AMC 10.40.050(B)(5).

**19.** AMC 10.40.010(B).

**20.** AMC 10.40.020(A).

**21.** AMC 10.45.010(A).

**22.** 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980).

**23.** *Id.* at 457, 100 S.Ct. 2286.

of the subject matter of his message."[24]

The Anchorage ordinance does not limit what an advertisement for an adult-oriented entertainment establishment may contain. It does, however, limit the topics about which a party may advertise without a license to operate the subject of the advertisement. For example, under the Anchorage Municipal Code persons are free to advertise for validly-licensed used automobile display lots even if they do not have the license to operate them.[25] Similarly, a person who does not have the license to operate a licensed carnival may advertise for it.[26] But under the AMC, only the licensed operator may advertise for an adult-oriented entertainment establishment or a public concert.

Despite the nature of the ordinance, we have conducted a *Central Hudson* analysis[27] and we conclude that AMC 10.40.050(B)(5) does not impermissibly interfere with Holding's commercial free speech rights.

First, the subsection regulates commercial speech concerning a lawful activity—adult-oriented entertainment—and the advertisements are not misleading.

Second, as Holding concedes, the municipality's interest in regulating adult-oriented businesses is substantial. The preamble to the ordinance explains that regulating and licensing adult-oriented establishments protect the general welfare, health, and safety of residents, maintains property values, reduces the level of criminal activity, and enforces community standards of morality.[28]

Third, limiting the ability to advertise for adult-oriented businesses to those persons licensed to operate those businesses directly advances the municipality's interests. The subsection closed a significant loophole in the regulation. Holding invokes the lack of operator continuity as his justification for placing advertisements to achieve business-name and telephone continuity. But Holding's justification for advertising is the very reason for closing the loophole. By forcing Holding to become licensed, or by forcing the license-holders to place their own advertisements,

**24.** *Id.* at 462 n. 6, 100 S.Ct. 2286; *see, e.g., City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 429, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). In *Discovery Network,* the Court characterized as content-based a city ordinance that prohibited the distribution of commercial handbills on public property but allowed the distribution of newspapers. Even though there was no evidence that the ordinance was motivated by animus toward any particular messages in the commercial handbills, the Court noted that the law was content-based because "whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack."

**25.** AMC 10.20.043.

**26.** AMC 10.45.030.

**27.** We recognize that some debate exists over the proper level of scrutiny for content-based restrictions on commercial speech. The debate began with the United States Supreme Court's decision in *R.A.V. v. City of St. Paul,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). The Court there struck down a city bias-motivated crime ordinance that prohibited the display of symbols which one knows or should know "arouses anger, alarm, or resentment in others on the basis of race, color, creed, religion or gender. . . ." The Court applied strict scrutiny to what it recognized was a content-based restriction on proscribable speech. After *R.A.V.,* some lower courts reasoned that if content-based restrictions on the "fighting words" at issue in *R.A.V.* received strict scrutiny, content-based restrictions on commercial speech should also receive strict scrutiny, because commercial speech has historically received more protection than fighting words. *See Citizens United for Free Speech II v. Long Beach Township Bd. of Comm'rs.,* 802 F.Supp. 1223, 1233 (D.N.J.1992) (applying strict scrutiny to content-based restriction on commercial speech). Several courts examined the issue without deciding which level of scrutiny to apply. *See Valley Broad. Co. v. United States,* 107 F.3d 1328, 1331 n. 3 (9th Cir.1997); *MD II Entm't, Inc. v. City of Dallas,* 28 F.3d 492, 495 (5th Cir.1994); *Hornell Brewing Co. v. Brady,* 819 F.Supp. 1227, 1232 (E.D.N.Y.1993). The Supreme Court has not directly addressed this issue, but decisions since *R.A.V.* suggest that the *Central Hudson* test remains the proper standard for regulations of commercial speech. In *Greater New Orleans Broadcasting Ass'n v. United States,* 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999), the Court applied the *Central Hudson* test to a federal law that prohibited some broadcasters from carrying advertisements for private casino gambling. This was the same statute the Ninth Circuit examined in *Valley Broadcasting* when it discussed the debate over the proper level of scrutiny for content-based restrictions on commercial speech. 107 F.3d at 1331 n. 3. *See also United States v. Edge Broad. Co.,* 509 U.S. 418, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993).

**28.** Anchorage, Alaska Ordinance No. 94–145(S) (Aug. 23, 1994).

the subsection encourages compliance with municipal regulation. It also encourages owners like Holding to lease to reliable operators. And it may discourage unscrupulous owners from tacitly permitting and profiting from improper on-premises activities while periodically replacing lessees to avoid complete closure. The municipality argues that the ordinance prevents those who advertise adult-oriented entertainment establishments from operating without a license. The municipality further asserts that regulation of these establishments "prevent[s] them from degenerating into prostitution houses and [prevents] other criminal activity from occurring on the premises...." We find this a plausible explanation that is consistent with the legislative purposes expressed in the ordinance.

Operator turnover diminishes the ability to regulate on-site activities. But given this lack of operator continuity, it is reasonable for the municipality to regulate an activity, perhaps the only activity—the placing and paying for advertising—that has continuity.

Fourth, the subsection is no more restrictive than necessary to advance the state's interests. The only precondition for advertising the business—a license—is also a precondition for operating or maintaining the business. It does not irrevocably prohibit Holding from advertising. He does not claim that he is ineligible to become a license holder. We therefore assume that the subsection as applied to Holding is narrowly tailored and allows him to advertise if he submits himself to the valid regulatory scheme by becoming licensed.

Holding's free speech rights are not unconstitutionally infringed by AMC 10.40.050(B)(5).

## IV. CONCLUSION

For these reasons we AFFIRM the superior court's decision on appeal and the findings of fact, conclusions of law, and final decision of the hearing officer.