PETITIONERS FOR INCORPORATION
OF CITY AND BOROUGH OF
YAKUTAT, Appellant,

v.

LOCAL BOUNDARY COMMISSION,
Appellee.

No. S–5760.

Supreme Court of Alaska.

April 28, 1995.

Rehearing Denied Sept. 14, 1995.

James T. Brennan, Hedland, Fleischer, Friedman, Brennan & Cooke, Anchorage, for appellant.

John B. Gaguine, Asst. Atty. Gen., and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Beth Phillips, Birch, Horton, Bittner & Cherot, Anchorage, for amicus curiae Chugach Alaska Corp.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ., and BRYNER, J. Pro Tem.*

## OPINION

BRYNER, Justice, pro tem.

## I. INTRODUCTION

A group of Yakutat residents designating themselves as the Petitioners for the Incorporation of the City and Borough of Yakutat (Petitioners) filed a petition for incorporation of the City and Borough of Yakutat. The Local Boundary Commission (LBC) voted to approve the petition, but altered the northwestern boundary of the proposed borough. Petitioners appealed to the superior court, challenging the LBC's decision to redraw the proposed borough's northwestern boundary.

After the superior court affirmed the LBC's decision, Petitioners filed this appeal. Petitioners claim that the LBC exceeded its authority by altering the boundary of the proposed borough without first determining that the proposed borough, with its boundaries unaltered, would fail to meet the statutory standards for incorporation. The LBC responds that it has the discretion to revise the boundaries of a proposed borough without initially finding that acceptance of the original boundaries would result in failure to meet the standards for incorporation. Alternatively, the LBC asserts that its approval of the petition in this case with the northwestern boundary of the proposed borough modified amounted to an implicit finding that the originally proposed boundary would have violated statutory standards.

## II. FACTS AND PROCEEDINGS

On December 26, 1990, Petitioners filed with the Department of Community and Regional Affairs (DCRA) a petition proposing the incorporation of a home rule borough and the concurrent dissolution of the City of Yakutat.[1] The petition generally described the boundaries of the proposed borough as extending along the Gulf of Alaska from Cape

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

1. The Alaska Constitution provides that "[t]he entire State shall be divided into boroughs, organized or unorganized." Alaska Const. art. X,

§ 3. The Alaska Constitution established the LBC to address municipal boundary issues, including borough formation, annexation, and boundary studies. Alaska Const. art. X, § 12.

Spencer at the southeastern boundary to Cape Suckling at the northwestern boundary.

The DCRA accepted the petition as correct in form and content. In August 1991, the DCRA issued a Draft Report on the petition and on proposed model borough boundaries that the DCRA had prepared for the Prince William Sound, Yakutat, and Cross Sound/Icy Straits regions.[2] The report recommended against approving the proposed Yakutat Borough on the basis that it failed to meet the statutory and regulatory standards, and instead recommended that the LBC adopt a model borough combining the Prince William Sound region with the Gulf Coast region, south to Cape Fairweather, including Yakutat.

The DCRA revised the Draft Report in response to public comment. Its Final Report recommended that the LBC reject the petition. Alternatively, the DCRA advised that if the LBC approved the petition, it should alter the northwestern boundary of the borough to conform to the location proposed in the model borough, the 141st Meridian.

After conducting extensive public hearings and holding three decisional meetings on the petition and on the model borough boundaries, on March 17, 1992, the LBC voted to approve the petition with its northwestern boundary altered from its originally proposed location at Cape Suckling to the DCRA's proposed location at the 141st Meridian.[3] On April 13, the LBC issued a Statement of Decision implementing its March 17 vote. The LBC subsequently denied Petitioners' request to reconsider the alteration of the northwestern boundary.

2. During 1991, the DCRA, at the direction of the LBC, was preparing model borough boundary reports that covered the entire unorganized borough in Alaska. The Yakutat area was part of two model borough boundary studies. Initially, the DCRA recommended that Yakutat be included within the same model borough boundaries as the Prince William Sound area, but later recommended that Yakutat be included with Hoonah and the Cross Sound/Icy Straits communities.

3. The LBC conducted extensive public hearings on the petition and on the model borough boundaries on January 17–19, 1992. The LBC also held three decisional meetings in Anchorage on February 5 and 26, and March 17, 1992, on the

Petitioners thereafter appealed the LBC's alteration of the northwestern boundary to the superior court. Superior Court Judge Michael A. Thompson affirmed the LBC's approval of the petition and its alteration of the boundary. Petitioners then appealed to this court.

## III. DISCUSSION

### A. The LBC Must Determine that the Petition is Statutorily Insufficient Before Amending Boundaries.

Petitioners assert that the LBC has no authority to alter the boundaries of a proposed borough unless it initially determines that the borough, as proposed, would fail to meet applicable standards for incorporation. Petitioners base their claim on AS 29.05.100(a), which prescribes the LBC's powers and duties in reviewing a petition for incorporation:

> If the Local Boundary Commission determines that a proposed municipality fails to meet the standards for incorporation, it shall reject the petition. If the commission determines that the proposed municipality meets the standards, it shall accept the petition. If the commission determines that the proposed municipal boundaries can be altered to meet the standards, it may alter the boundaries and accept the petition.

Petitioners point out that the first two sentences of this provision set forth the LBC's functions in mandatory terms: if a proposed borough fails to meet the standards for incorporation,[4] the LBC "shall" reject the

Yakutat Borough petition. On February 5, the commissioners decided to consider the Yakutat petition before deciding the model boundaries for the area. On March 17, a motion was made to approve the petition with the southern boundary adjusted to Cape Fairweather and the northwestern boundary of Cape Suckling. By a 3–2 vote, the motion was amended to adjust the northwestern boundary to the 141st Meridian. The LBC decided, by a 4–1 vote, to approve the petition to incorporate the City and Borough of Yakutat as amended.

4. AS 29.05.031(a) articulates the standards for borough incorporation:

petition; if the proposed borough meets the standards, the LBC "shall" accept the petition. Given the mandatory wording of the first two sentences, Petitioners maintain that the final sentence of the provision, which allows the LBC to alter boundaries, applies only when the LBC determines that boundary changes are necessary to enable a proposed borough to meet the standards for incorporation. Petitioners contend that the LBC failed to follow the statutory procedure in amending the northwestern boundary of the proposed Yakutat Borough, because the LBC never determined that the borough, with its northwestern boundary at Cape Suckling as originally proposed, would fail to meet the statutory standards for incorporation.

The LBC responds that it possesses "the broad power of accepting the petition, rejecting the petition, or altering the petition so that it would meet the statutory standards." The LBC notes that its authority to alter boundaries is established by the third sentence of AS 29.05.100(a), which states, "[i]f the commission determines that the proposed municipal boundaries can be altered to meet the standards, it may alter the boundaries and accept the petition." The LBC reads this sentence as giving it unrestricted discretion to alter the boundaries of a proposed borough, provided that the altered boundaries meet the standards for incorporation. However, the LBC makes the mistake of reading the third sentence of AS 29.05.100(a) in isolation and out of context. "[T]his court interprets each part or section of a statute with every other part or section, so as to create a harmonious whole." *Rydwell v. Anchorage School Dist.*, 864 P.2d 526, 528 (Alaska 1993) (citing *Forest v. Safeway Stores, Inc.*, 830 P.2d 778, 781 (Alaska 1992)). When the third sentence of AS 29.05.100(a) is read

in conjunction with the preceding sentences of the provision, the LBC's proposed interpretation makes little sense.

■■■ The first two sentences of AS 02.05.100(a) provide that the LBC "shall" deny petitions for incorporation that do not meet applicable standards and that it "shall" grant petitions that do. Use of the word "shall" in these sentences is significant, for it indicates the legislature's intent to mandate that the LBC accept petitions that meet the statutory standards and reject those that fail. *Fowler v. City of Anchorage*, 583 P.2d 817, 820 (Alaska 1978) ("Unless the context otherwise indicates, the use of the word 'shall' denotes a mandatory intent.") In context, then, the third sentence of subsection (a), by providing that the LBC "may" alter boundaries "to meet the standards," was apparently intended to allow the LBC a measure of discretion that would otherwise be denied by the first two sentences—the discretion to avoid mandatory rejection of a non-conforming petition when the petition's failure to meet applicable standards could be cured by altering its proposed boundaries.

The specific wording of the statute's third sentence supports this contextual meaning. In the language of the third sentence, which permits the LBC "to alter the boundaries and accept the petition" if the "boundaries can be altered *to meet the standards*," the legislature's choice of the purposive phrase "to meet the standards"·plainly suggests that any alteration of boundaries must be for the purpose of achieving compliance with the standards for incorporation. This purpose necessarily presupposes a threshold determination by the LBC that the originally proposed boundaries would not meet the applicable standards.

An area that meets the following standards may incorporate as a home rule, first class, or second class borough:

(1) the population of the area is interrelated and integrated as to its social, cultural, and economic activities, and is large and stable enough to support borough government;

(2) the boundaries of the proposed borough conform generally to natural geography and include all areas necessary for full development of municipal services;

(3) the economy of the area includes the human and financial resources capable of providing municipal services; evaluation of an area's economy includes land use, property values, total economic base, total personal income, resource and commercial development, anticipated functions, expenses, and income of the proposed borough;

(4) land, water, and air transportation facilities allow the communication and exchange necessary for the development of integrated borough government.

Moreover, if the third sentence of AS 29.05.100(a) were interpreted to give the LBC discretion to amend proposed boundaries without a preliminary finding of statutory noncompliance, then the first two sentences of the statute would become superfluous, since their use of the word "shall" would essentially be stripped of its commonly understood mandatory effect.[5]

In short, we find unpersuasive the LBC's proposal to read AS 29.05.100(a) as empowering it to alter boundaries of proposed boroughs without any preliminary finding of noncompliance. This conclusion, however, requires us to consider the breadth of the LBC's power to reject a petition as failing to meet the statutory standards for incorporation.

In the present case, Petitioners fault the LBC for proceeding to determine what would be the "most appropriate boundary" for the proposed Yakutat Borough without first determining if the boundaries proposed in the original petition for incorporation were minimally sufficient to meet the statutory standards for incorporation. Petitioners' position is essentially that, prior to a finding of noncompliance, the LBC's sole legitimate power under AS 29.05.100(a) is to review a petition for compliance with statutory standards and to accept the petition when it does meet those standards; in Petitioners' view, if a petition's boundaries, as proposed, are minimally sufficient to meet statutory standards, the LBC is barred from any consideration of the most appropriate boundary. We find this to be an unduly constricted view of the LBC's powers under AS 29.05.100(a).

■ The scope of the LBC's powers under AS 29.05.100(a) is to be determined in light of the constitutional provision that the statute implements. Article X, section 3 of the Alaska Constitution provides, in relevant part:

The entire State shall be divided into boroughs, organized or unorganized. They shall be established in a manner and according to standards provided by law.

The standards shall include population, geography, economy, transportation, and other factors. Each borough shall embrace an area and population with common interests *to the maximum degree possible.*

(Emphasis added.)

■ To avoid conflict with the constitutional mandate that each borough "embrace an area and population with common interests to the maximum degree possible," the provisions of AS 29.05.100(a) dealing with the rejection, acceptance, and alteration of proposed boroughs must be interpreted to require that the LBC apply the statutory standards for incorporation in the relative sense implicit in the constitutional term "maximum degree possible." In other words, AS 29.05.100(a) must be construed to mean that, in deciding if the statutory standards for incorporation have been met, the LBC is required to determine whether the boundaries set out in a petition embrace an area and population with common interests to the maximum degree possible.

■ Thus read, AS 29.05.100(a) authorizes the LBC to accept a petition for incorporation, as proposed, only when the originally proposed boundaries maximize common interests; when they do not, the statute precludes a finding of compliance and requires the commission either to reject the petition outright or, if compliance with statutory standards can be achieved by altering boundaries, to exercise its discretionary power to redraw the original proposal. An informed decision as to whether boundaries proposed in a petition for incorporation maximize the common interests of the area and population and thus meet the applicable statutory standards presupposes a thorough consideration of alternative boundaries and a decision as to what boundaries would be optimal. For this reason, in discharging its duties under AS 29.05.100(a), the LBC is inevitably called upon to undertake precisely the type of inquiry that Petitioners allege to be improper:

---

**5.** *See Alaska Transp. Comm'n v. Airpac, Inc.*, 685 P.2d 1248, 1253 (Alaska 1984) ("There is a presumption that every word, sentence, or provision was intended for some useful purpose, has some force and effect, and that some effect is to be given to each, and also that no superfluous words or provisions were used.") (quoting 82 C.J.S. *Statutes* § 316 (1953)).

an inquiry into the "most appropriate boundaries" for the proposed borough.

In summary, by requiring that each borough "embrace an area and population with common interests to the maximum extent possible," article X, section 3 of the Alaska Constitution necessarily vests the LBC with power to find non-compliance when the boundaries originally described in a petition for incorporation do not maximize common interests. Thus, although AS 29.05.100(a) requires a preliminary finding of non-compliance before the boundaries of a proposed borough may be altered, the LBC, in passing on the issue of compliance, has broad authority to decide what the most appropriate boundaries of the proposed borough would be.

B. *The LBC Impliedly Found that the Yakutat Borough, as Proposed, Would Fail to Meet the Standards for Incorporation.*

This leads us to the issue of whether the LBC's findings in the present case comport with the requirements of AS 29.05.100(a). It is undisputed that the LBC made no express finding of non-compliance before deciding to alter the northwest boundary of the proposed Yakutat Borough. Petitioners contend that the lack of an express finding requires reversal of the LBC's decision. However, in *Valleys Borough Support Committee v. Local Boundary Commission,* 863 P.2d 232, 234–35 (Alaska 1993), we determined that the LBC had "impliedly found" that a petition for borough incorporation failed to meet applicable standards. Concluding that this implied finding was rationally based, we went on to uphold the LBC's decision. *Id.* at 234. As the LBC correctly argues in the present case, *Valleys Borough* establishes that a finding of non-compliance under AS 29.05.100(a) may be made either expressly or by implication. Thus, the critical question here is whether an implied find-

ing of non-compliance can be gleaned from the record.

To resolve this question, it is useful to consider the circumstances under which we determined that an implied finding had been made in *Valleys Borough.* In *Valleys Borough,* the LBC voted to reject outright one of two competing petitions for borough incorporation. *Id.* at 233. In explaining the basis for its rejection, the LBC had stated that the area within the support committee's petition was "not cohesive enough *at this time* to [be] within the same *organized* borough." *Id.* On appeal we deemed the LBC's phrase, "not cohesive enough" to be a reference to the statutory standard for incorporation set forth in AS 29.05.031(a)(1), which requires the LBC to find that the population of a proposed borough "is interrelated and integrated as to its social, cultural, and economic activities." *Id.* at 234. On this basis, we held that the LBC had impliedly found a lack of compliance with AS 29.05.031(a)(1). *Id.*

The obviousness of the implied reference to AS 29.05.031(a)(1) in *Valleys Borough* was established by language from this court's earlier ruling in *Mobil Oil Corp. v. Local Boundary Commission,* 518 P.2d 92, 98 (Alaska 1974), *quoted in Valleys Borough,* 863 P.2d at 234, where we characterized the LBC's task as involving "[a] determination whether an area is cohesive and prosperous enough for local self-government." The phrasing of the LBC's finding was thus a close paraphrasing of this court's own description of the standards for incorporation.

The situation in the present case is analogous. The findings contained in Conclusion # 3 of the LBC's Statement of Decision in this case make it plain that the LBC shifted the northwest boundary of the proposed Yakutat Borough from Cape Suckling to the 141st Meridian because the commission believed that the affected area lacked sufficient cohesiveness to the remaining area of the borough and enjoyed greater ties and common interests with the Prince William Sound area.[6] Indeed, the basis for the

---

6. Although the individual findings in Conclusion # 3 are not listed by number in the Statement of Decision, they are obviously distinct, and we refer to them by numbers corresponding to their listed order. Pertinent here are findings # 7, 9, 10, 11, and 18:

Finding # 7: Land ownership by Yakutat residents in the area west of the 141st meridian is minimal compared to the size of the area.

LBC's action is evident from the title it gave to Conclusion # 3 of its Statement of Decision: *"THE MOST APPROPRIATE BOUNDARIES FOR THE CITY AND BOROUGH OF YAKUTAT EXTEND FROM THE 141ST MERIDIAN IN THE WEST TO THE SOUTHERN BOUNDARY LAST PROPOSED BY PETITIONERS, A LINE DRAWN FROM THE TOP OF MOUNT FAIRWEATHER TO CAPE FAIRWEATHER."* (Emphasis added.)

Because the LBC based its decision that the 141st Meridian was the most appropriate boundary for the proposed borough on criteria reflecting the common interests of the area and its population, and because the LBC plainly meant its decision to ensure that the area and population to be included in the approved borough would be maximally cohesive, the decision itself was tantamount to a declaration that the originally proposed boundaries did not comply with the standards for incorporation—that they failed to "embrace an area and population with common interests *to the maximum degree possible.*" [7]

In this respect, the LBC's decision in the current case corresponds closely to its *Valleys Borough* finding that the petition was not "cohesive enough ... to [be] within the same organized borough." We hold here, as we did in *Valleys Borough*, that the LBC impliedly determined that the petition, as submitted, failed to meet the standards for incorporation.

> *Finding # 9:* The Emergency Air Service contract for the Icy Bay logging camp is held by a Yakutat air company; however, major landowners in the disputed territory believe that activity in the area, and the development of its resources, will look to Prince William Sound rather than Yakutat.
> *Finding # 10:* The transportation links to the area west of the 141st meridian, limited to boat and unscheduled flights, are somewhat more attenuated than in the other parts of the borough.
> *Finding # 11:* The petitioners established use of the western area by Yakutat residents; however, it is used to a much lesser extent than the area to the east of the 141st. For example, information in the petition indicated only 2% to 26% of households used various areas west of the 141st for subsistence purposes.
> *Finding # 18:* The LBC did not consider model borough boundaries in reaching its de-

## C. *The LBC Did Not Rely On Improper Criteria in Amending the Proposed Boundary.*

Petitioners lastly argue that, even if the LBC's decision were construed as determining that the originally proposed borough boundaries failed to meet the statutory standards for incorporation, the LBC based its decision on non-statutory criteria and therefore erred. In advancing this argument, Petitioners rely primarily on the LBC's consideration of the possible future creation of a Prince William Sound Borough and of interests voiced by Chugach Alaska Corporation, a regional Native corporation based primarily in Prince William Sound whose boundary under the Alaska Native Land Claims Settlement Act is drawn at the 141st Meridian.

■ Petitioners' arguments, however, reflect the mistaken premise that the LBC must approve any minimally acceptable petition for incorporation and has only limited authority to consider or adopt "the most desirable" borough boundaries. Given the Alaska Constitution's mandate that boroughs be cohesive "to the maximum degree possible," [8] the LBC acted well within the purview of its authority in considering the desirability of future incorporation of neighboring areas such as Prince William Sound and the interests of affected land owners and users such as the Chugach Alaska Corporation. [9] We

cision on the Yakutat borough petition as model boundaries for the area have not yet been adopted. However, the LBC did consider the impact of the Yakutat proposal on the adjacent regions.

7. Alaska Const., art. X, § 3 (emphasis added).

8. Alaska Const., art. X, § 3.

9. In their reply brief, Petitioners challenge the authority of the LBC to promulgate regulations such as 19 AAC 10.060(a)(1), which expressly authorized the LBC to consider "land use and ownership patterns" in determining compliance with the statutory standards set out in AS 29.05.031(a). *See, e.g., Warner v. State,* 819 P.2d 28, 32 n. 3 (Alaska 1991); *State v. Anderson,* 749 P.2d 1342, 1345 (Alaska 1988). We need not decide the issue, since even in the absence of the challenged regulations, the LBC clearly had authority to consider information and arguments

find no merit to Petitioners' claim of improper reliance on non-statutory criteria.

## IV. CONCLUSION

As we have emphasized on previous occasions, "the Local Boundary Commission has been given a broad power to decide in the unique circumstances presented by each petition whether borough government is appropriate." *Mobil Oil,* 518 P.2d at 98–99. We have similarly emphasized that "[t]he standards for incorporation set out in AS 07.10.030 were intended to be flexibly applied to a wide range of regional conditions." *Id.* at 98. Here, "we perceive in the record a reasonable basis of support for the Commission's reading of the standards and its evaluation of the evidence." *Id.* at 99. Accordingly, we affirm the LBC's acceptance of the incorporation petition, as modified.

AFFIRMED.

such as those presented by the Chugach Alaska Corporation in addressing the statutory standards articulated in AS 29.05.031(a). In particular, we note that AS 29.05.031(a)(1) gives the LBC power to consider whether "the population of the area [included in the proposed borough] is interrelated and integrated as to its social, cultural, and economic activities."